UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

FILED
U.S DISTRICT COURT
MIDDLE DIST. OF LA.

1991 AUG 29 PM 2:50

LEE DUPUIS
CLERK

JANICE G. CLARK, ET AL

VERSUS

CHARLES E. "BUDDY" ROEMER, ET AL

CIVIL ACTION

NO. 86-435-A


SUPPLEMENTAL FINDINGS OF FACT
AND
CONCLUSIONS OF LAW


The Supreme Court has held plainly and clearly as to the election of justices of the Louisiana Supreme Court, in **Chisom v. Roemer**, _____ U.S. _____, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) that:

> . . . Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone. It is difficult to believe that Congress, in an express effort to broaden the protection afforded by the Voting Rights Act, withdrew, without comment, an important category of elections from that protection. Today we reject such an anomalous view and hold that State judicial elections are included within the ambit of § 2 as amended.

111 S.Ct. at 2368.

On the same date, in **Houston Lawyers' Ass'n v. Attorney General of Texas (LULAC)**, _____ U.S. _____, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), the Court made it plain that Section 2 applies as well to election of State trial judges:

> It is equally clear, in our opinion, that the coverage of the Act encompasses the election of executive officers and trial judges whose responsibilities are exercised

4885

independently in an area coextensive with the districts from which they are elected. If a State decides to elect its trial judges, as Texas did in 1861, those elections must be conducted in compliance with the Voting Rights Act.

111 S.Ct. at 2380.

Thus, the Court has now confirmed this court's original construction of Section 2 in this case. See **Clark v. Edwards**, 725 F. Supp. 285 (M.D. La. 1988).

This matter is now before the court on a motion by plaintiffs for an order that special elections be held this fall under a remedial plan[1] and a motion by the State for reconsideration as to the Fortieth Judicial District. On August 19th, 20th and 21st, the court conducted an evidentiary hearing on both motions, with particular reference to Justice Stevens' remarks in the **LULAC** case that:

> . . . we believe that the State's interest in maintaining an electoral system – in this case, Texas' interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters – is a legitimate factor to be considered by courts among the "totality of circumstances" in determining whether a § 2 violation has occurred. A State's justification for its electoral system is a proper factor for the courts to assess in a racial vote dilution inquiry, . . . Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the "totality of circumstances," that interest does not automatically, and in every case outweigh proof of racial vote dilution.

**LULAC**, 111 S.Ct. at 2381.

---

[1] The districts at issue are the First, Fourth, Ninth, Fourteenth, Fifteenth, Eighteenth, Nineteenth, Twenty-Fourth and Fortieth Judicial District Court; East Baton Rouge Family Court; and the First Circuit Court of Appeal, District Two.

At the conclusion of that hearing, the court orally gave its reasons for maintaining its prior rulings and ordering special elections to proceed this fall in districts where violations of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §1973, had been previously found.  The court now renders formal supplemental findings of fact and conclusions of law.  The court will additionally take up a motion by the State defendants for a stay of the order directing judicial elections to be held this fall.

The court's original findings, reported at 725 F. Supp. 285, as modified by its findings of June 12, 1990, are hereby readopted.

**Procedural Posture of this Matter**

At this late stage in the proceedings, it suffices to say that this class action challenges the current at-large election scheme employed by the State of Louisiana in connection with the election of district, family court and court of appeal judges.  Plaintiffs contend that the practice of electing judges at-large within judicial districts operates to dilute black voting strength in violation of Section 2 of the Voting Rights Act.  The appropriate remedy, according to plaintiffs, is to create subdistricts within judicial districts for election purposes.

Initially, it should be clearly understood that the court is not rushing to judgment, despite the fact that this case was remanded by the Supreme Court as recently as June 28th.  A considerable amount of evidence has been received and numerous rulings have been made by the court over the last five years.

4887

Particularly noteworthy is the court's ruling dated August 15, 1988, **Clark v. Edwards**, 725 F. Supp. 285 (M.D. La. 1988), following the trial on liability. At that time, the law in the Fifth Circuit was that Section 2 applied to judicial elections, **Chisom v. Edwards**, 839 F.2d 1056 (5th Cir. 1988) **cert. denied, sub. nom. Roemer v. Chisom**, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). After making extensive factual findings, the court followed the analysis set forth in **Thornburg v. Gingles**, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), for determining when the use of at-large election schemes constitutes a violation of Section 2.

The court concluded that the "totality of the circumstances" inevitably showed that the present at-large scheme for judicial elections affords black citizens "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." The court further found that, although minority vote dilution had not been proven in each judicial district[2], that the remedy was to revise the system statewide. An injunction was issued precluding the holding of all family court, district court and court of appeal elections pending revision of the system.

Not long thereafter, the Fifth Circuit vacated that injunction observing that **Thornburg** required this court to act on a district by district basis rather than statewide. The Fifth Circuit found

---

[2]  On August 31, 1988, the court entered a ruling specifying the districts where Section 2 violations had been found. See **Clark v. Edwards**, 725 F.Supp. 285, 303-307 (MD La. 1988).

4888

that the injunction was additionally inconsistent with the teachings of **Reynolds v. Sims**, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) based upon its conclusion that the State authorities had not been given a reasonable opportunity to correct the violations. In vacating the injunction, the Fifth Circuit stated:

> "We have no reason to doubt that the governor and legislature of Louisiana will promptly and properly respond to any violations of constitutional rights of the citizens of Louisiana. Should they fail to do so, it will then be incumbent upon the district court to act."

While that prophecy ultimately proved to be incorrect, this court delayed the remedy hearing in this matter for well over a year. During that interim, the Legislature adopted a "package" of constitutional and statutory amendments contingent upon approval of the voters. In November of 1989, the people of this State voted against the proposed revisions. Since that time, the Legislature has failed to take any further action or to respond in any fashion to the Section 2 violations found to exist by the court; nor has any request been made for additional consideration since the remand.

In February of 1990, the court held a trial on the remedy issues. The court additionally took up motions by the defendants and the Orleans Trial Judges Association for reconsideration of the court's findings on liability. Over the next few months, the court painstakingly considered the numerous maps, plans and proposals submitted by the parties. As the court was ready to render its findings of fact and conclusions of law on the remedy

4889

phase, a panel of the Fifth Circuit rendered a decision inconsistent with **Chisom v. Edwards**, 839 F.2d 1056 (5th Cir. 1988). Although Section 2 was applicable to judicial elections, it was found that "there is no such thing as a 'share' of a single-member office" and that consequently county wide elections of district court judges in Texas was not violative of Section 2. **League of United Latin American Citizens Council No. 4434 v. Clements**, 902 F.2d 293 (5th Cir. 1990). A few days after the panel decision, a rehearing was granted en banc which under Fifth Circuit rules vacated the panel decision.

About that same time, however, this court had reached the inescapable conclusion that in view of **Thornburg, supra**, it lacked the power to impose a systematic remedy on the State and that any remedy must be limited to the "guilty" districts. The court further found merit to several of the arguments made for reconsideration as to liability. On June 12, 1990, faced with the fall 1990 regularly scheduled judicial elections, the court found it imperative to issue its findings of fact and conclusions of law which essentially opened the door for elections to be held in all but eleven districts.[3] In addition to supplementing and modifying its findings of vote dilution on a district by district basis, the court carefully considered a plethora of remedy proposals. Ultimately, the court reluctantly concluded that the subdistrict

---

[3] That ruling naturally had no effect upon Section 5 violations.

6

approach suggested by plaintiffs is the only proposal within the court's power that will actually remedy the Section 2 violations.

On September 28, 1990, the Fifth Circuit handed down its en banc ruling in **LULAC**, essentially holding that the 1982 amendment to Section 2 providing for a "results test" method of proving vote dilution claims is inapplicable to judicial elections. **League of United Latin American Citizens Council No. 4434 v. Clements**, 914 F.2d 620 (5th Cir. 1990). **Chisom** was specifically overruled. On October 2, 1990, this court heard a motion by defendants "to dissolve injunction" on an expedited basis. The motion was granted in open court. Since the regularly scheduled date for primary elections was October 6th, the court ordered judicial elections in the eleven affected districts to be held on the November 6th general election date, and set the next day, October 3rd as the opening date for qualification, as urged by defendants. On October 19th, the court signed a partial final judgment dismissing the Section 2 claims.

Certiorari was granted by the Supreme Court in the **LULAC** and **Chisom** cases on January 18, 1991. On June 18th of this year, the Supreme Court handed down rulings in both cases reversing the Fifth Circuit and squarely holding that Section 2(b) applies to judicial elections. **Houston Lawyers' Ass'n v. Attorney General of Texas**, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991); **Chisom v. Roemer**, _____ U.S. _____, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). On June 28th, this court's judgment was vacated and remanded by the Supreme Court "for further consideration in light of **Chisom v. Roemer**..."

7

Clark  v.  Roemer, _____ U.S. _____, 111 S.Ct. 2881, 115 L.Ed.2d 1047 (1991).

On July 5th, plaintiffs filed a motion requesting that the court order special elections to remedy the Section 2 violations previously found.  The court granted the motion in part following oral argument held on July 17th.  The court expressly rejected the argument made by defendants that the Supreme Court created a "new threshold test" requiring plaintiffs in Section 2 cases to establish that they have less opportunity to participate in the political process.

After denying a motion by plaintiffs to reopen the court's findings in certain districts where no violation of Section 2 had been found, an evidentiary hearing was held on August 19th through 21st, on the pending motions.


**Summary of Additional Evidence**

The first witness called to establish the State's interest in continuing its present election scheme was Eugene Murett, a former executive counsel to the Governor and a former Judicial Administrator for the Louisiana Supreme Court.  According to Mr. Murett, there is a general concern that smaller election districts would subject judges to more special interest pressures.  Under the present scheme, some litigants and lawyers have made complaints of "hometown justice."  Mr. Murett further expressed his belief that it is important to link the geographical area from which a judge is elected to the area of his jurisdiction.  In his opinion, more

4892

harm than benefit would result from the imposition of subdistricting in judicial elections. He also observed that merit selection judges is preferable to popular election.

Camille Gravel, a long time Louisiana lawyer and former Executive Counsel to the Governor, likewise testified that subdistricts would increase public perception of hometown justice and would be more detrimental than beneficial. In his view, the number of jury trials would also increase as public opinion of the judicial system erodes. Mr. Gravel felt that subdistricting would only intensify the problems inherent in electing judges. Mr. Gravel, conceding that he had not considered the matter at length, felt that plurality voting would be a better way to remedy the Section 2 violations. He also suggested appointment by nominating commission as an improvement over popular election. Similar sediments were expressed by Wood Brown, III, former President of the Louisiana State Bar Association, who has litigated in 26 of the 41 judicial districts in this State.

Defendants and the LDJA then called several distinguished retired judges to the stand. Former Chief Justice of the Louisiana Supreme Court, John A. Dixon, viewed subdistricting as the "worst possible way" to remedy a Section 2 violation. According to Justice Dixon, subdistricting would be a step backwards in race relations. In his opinion, merit selection would be the best remedy.

Former Chief Judge of the First Circuit Court of Appeal, Fredrick Ellis, testified that "continuity" of appellate judgeships

4893

is an important consideration. That is, the present scheme of staggering elections at the Court of Appeal level permits more experienced judges to sit on panels with newly elected judges. Judge Ellis observed that the business of rendering appellate decisions is quite different from judging at the trial court level. Over the long term, continuity in a Court of Appeal promotes consistency in decisions not only on the short term basis but furthers "jurisprudence constant" as well. Larger districts and longer terms of office for appellate court judges are other components of the present scheme for Court of Appeal judges that serve to keep appellate judges detached from local interests and pressures. Judge Ellis additionally noted that the practice of the First Circuit in composing three member panels (by taking one judge from each of the three election districts) acts to link the geographic area of the court as a whole with decisions made by each panel.

The Honorable Lewis Doherty served for many years as a district court judge and on the First Circuit and Supreme Court on an ad hoc basis. Judge Doherty's testimony was the same as Judge Ellis--the longer terms and larger size of election districts for the courts of appeal promotes objectivity and detachment from local issues. Judge Doherty also felt that the way panels were formed in the First Circuit was important in maintaining impartiality.

The Honorable Mack E. Barham served on the District Court in Quachita Parish and the Second Circuit Court of Appeal and the Louisiana Supreme Court. Mr. Barham testified that, when he

4894

retired from the bench, he was shocked to discover how poorly the judiciary was perceived throughout the State. Mr. Barham also advocated a merit selection system, stressing the large amount of funds needed to campaign for judge and that in reality contributions are mainly received from lawyers who practice before the judge. However, Mr. Barham viewed subdistricting as a "disastrous" remedy for the same reasons expressed by the other witnesses for the defendants.

Defendants additionally presented the testimony of three registrars of voters from Quachita Parish, Caddo Parish and East Baton Rouge Parish. Essentially, each registrar testified that numerous election drives had been conducted in their parish at schools, stores and community centers in any effort to increase voter registration. Documentation relating to many of these drives was submitted into evidence by defendants.

Robert C. Williams, a black lawyer who has been active in political campaigns, was called, apparently for the purpose of confirming that there are no longer "structural" barriers to voting by blacks in Louisiana. He did not agree. Mr. Williams conceded that there are no longer laws restricting black voter access to the electoral process in Louisiana but in his view, because of past de jure discrimination and present socio-economic factors, even the requirement that black people apply for registration is a barrier.

Defendants presented expert testimony from Dr. Weber, a professor of political science. His concerns with subdistricting were two-fold: (i) the smaller the district the less diverse the

4895

electorate; and (2) larger districts provide the "maximum accountability," i.e. judges are accountable to a large segment of the population. Dr. Weber disapproved of "mismatching" election districts with the jurisdictional territory of a judge.

As to the Fortieth Judicial District, Dr. Weber discussed the 1990 elections for Divisions "A" and "B." In November of 1990, five candidates ran for election in Division "A," including Judge Caire, the white incumbent, and Madeline Jasmine, a black female. Jasmine received the highest number of votes (32.6%) and Judge Caire came in third with 22.2% of the votes. In the runoff election in December, Jasmine won, receiving 54% of the total votes.

In Division "B," the white incumbent, Judge Malik, defeated a white opponent. Dr. Weber gave his opinion that both Judge Malik and Judge Jasmine were the preferred black candidates in those elections. Dr. Weber testified that the 1990 election results establish that a black can be elected in Fortieth Judicial District.

Plaintiffs called Judge Robert Gibbs, a black Circuit Judge for Hinds and Yazoo Counties in the State of Mississippi. Judge Gibbs was elected in 1990 from a judicial subdistrict imposed as a remedy in connection with a similar lawsuit challenging Mississippi's use of at-large election districts for judicial office holders. See **Martin v. Mabus**, 700 F. Supp. 327 (S.D. Miss. 1988). He testified that there are two white and two black circuit judges in the judicial district. The subdistrict from

12

which he was elected has a population of about 78,000 and includes Jackson, Mississippi. Judge Gibbs denied being affected by local pressures, noting that in most cases he does not know whether a party resides within his subdistrict. He also stated that he is aware of no pressure upon his colleagues of either race.

Judge Gibbs further testified that his being on the bench had actually improved the perception by blacks of the judicial system. According to Judge Gibbs, black jurors have been pleasantly surprised when he takes the bench. Judge Gibbs expressed his belief that blacks have a new sense of pride and confidence in the judicial system now that there are some black judges on the bench. In comparison, three of the named plaintiffs in this action, testified that the general perception by the black community of the judicial system in Louisiana is one of apprehension and mistrust.

Barry Powell, a white trial lawyer in a large firm in Jackson, Mississippi, testified as to the bench-bar relationship since subdistricting has been imposed there. Mr. Powell testified that "hometown justice" in subdistricts has not been a concern of the Bar following imposition of the subdistrict remedy by the Southern District of Mississippi in 1988. As lawyers all over the district are traditionally involved in judicial races, Mr. Powell testified that all of the judges were held accountable in the same fashion as prior to subdistricting. He additionally indicated that the prior system was perceived to be unfair to blacks.

Plaintiff's expert in political science, Dr. Richard Engstrom, reviewed certain tables submitted into evidence relating to the

13

4897

population size of judicial districts as presently drawn and subdistricts proposals presented by Dr. Weber to the court. Dr. Engstrom concludes that the current use of judicial districts with population figure under 10,000 shows that the State has no policy against creating judicial districts that size.

In connection with the proposal made by defendants for plurality vote by division, Dr. Engstrom noted a "well known" generalization in the literature that plurality elections tend to have less candidates as opposed to majority elections where a candidate's initial effort is simply to get into the run off. He further noted that, in all the Louisiana elections he has studied, there has never been a judicial election where a black-preferred candidate would have benefited by dropping the majority vote requirement, including the recent election held in the Fortieth Judicial District. Simply put, if the majority voters do not scatter their votes among several candidates, the minority preferred candidate loses.

In connection with recent suggestions that there be plurality without divisions, Dr. Engstrom expressed his view that this would allow for single-shot voting by black voters, that is, black voters theoretically could win by casting votes for their preferred candidate only. However, Dr. Engstrom was of the opinion that this would not cure vote dilution because it necessarily depends upon majority voting patterns as well. As exhibit P-8 demonstrates, such a system would not eliminate minority vote dilution in the eleven trial court districts. One of the worst features of this

14

procedure would be to require all judges to become candidates in every election.

With regard to the Fortieth Judicial District, Dr. Engstrom stressed that Judge Jasmine received only 1.4% of the non-black vote in the primary and 22.1% of the non-black vote in the run off. Dr. Engstrom considered this to be an atypical election inasmuch as it was conducted while this action was pending, Judge Jasmine was endorsed by the local district attorney (white) and the black turnout was higher than usual. According to Dr. Engstrom, Judge Jasmine would not have been elected if white turnout had been equal.

**New Test Argument**

The State defendants advance the proposition set forth in Justice Scalia's dissent in **Chisom v. Roemer**, that the Court has now established a new test for finding Section 2 violations, different from the **Thornburg** standard. See 111 S.Ct. at 2371.

In this court's view, it is very doubtful that the majority in **Chisom** intended to set new obstacles for plaintiffs attempting to prove Section 2 violations. Justice Stevens, for the majority, makes it plain that Justice Scalia speaks only for the dissent, not the Court:

> Any abridgement of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election. As the statute is written, however, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process. The statute

4899

does not create two separate and distinct rights. Subsection (a) covers every application of a qualification, standard, practice, or procedure that results in a denial or abridgement of **"the right"** to vote. The singular form is also used in subsection (b) when referring to an injury to members of the protected class who have less "opportunity" than others "to participate in the political process **and** to elect representatives of their choice." 42 U.S.C. § 1973 (emphasis added). It would distort the plain meaning of the sentence to substitute the word "or" for the word "and." Such radical surgery would be required to separate the opportunity to participate from the opportunity to elect.

111 S.Ct. at 2365.

The fact that three of 64 parish registrars of voters regularly conduct registration drives does not establish that all barriers to minority voter access have been removed in Louisiana. The historical de jure and de facto restriction on minority voting, the socio-economic factors and other matters set forth in this court's earlier rulings have not been shown to have dissipated. They still operate to discourage more blacks than whites from full participation. This court does not accept the notion that black people voluntarily remain under-educated and poor and thus bring their lack of participation upon themselves. The court does concede that some progress has been made, and lauds the efforts of the three registrars of voters who testified.

For these reasons and those previously given at oral argument held on July 17, 1991 and again at the conclusion of the hearing held August 19 - 21, the court rejects the argument of defendants that plaintiffs must make some further showing as to the "participation issue."

16

**Adoption of Prior Findings and Conclusion as to § 2 Violations**

No good purpose would be served by the court restating the numerous findings of fact and conclusions of law previously reached in this matter, as noted above. In short, the court adopts its prior findings and conclusions made in connection with the ultimate decision that plaintiff's have proven Section 2 violations in eleven judicial districts.

Having reviewed the totality of the evidence as presented in 1988, 1990 and 1991, this court has once again, ". . . carefully considered the totality of the circumstances and found that in each district racially polarized voting; the legacy of official discrimination in voting matters, education, housing, employment, and health services; and the persistence of campaign appeals to racial prejudice acted in concert with the . . . districting scheme to impair the ability of geographically insular and politically cohesive groups of black voters to participate equally in the political process and to elect candidates of their choice . . ." **Thornburg v. Gingles**, 478 U.S. 30, 80, 106 S.Ct. 2752, 2781, 92 L.Ed.2d 25 (1986). Thus, the court maintains its prior ruling that black voters in those eleven judicial districts have less opportunity to elect representatives of their choice because they have less opportunity to participate in the political process under the current election scheme.

**State Interest Affecting Violation**

In remanding the **LULAC** case to the Fifth Circuit, Justice Stevens clearly recognized the State's interest in "maintaining a

4901

link between a district judge's jurisdiction and the area of residency of his or her voters" as a relevant factor in determining the "totality of the circumstances that must be considered under the "results test" of Section 2 in connection with a finding of violation and with the imposition of a remedy. The Fifth Circuit has scheduled oral argument in that matter for November 4th. While it might be desirable to await the Fifth Circuit's ruling on remand, this court, for reasons stated below, finds that a remedy in this matter is long overdue.

The State defendants suggest that under Justice Stevens' reference in **LULAC**, the State's interest in maintaining the link between a district judge's jurisdiction and the area of residency of his or her voters, precludes any finding of violation in Louisiana's electoral scheme.

Evidence was presented to the court at the hearing conducted on August 19, 20 and 21 concerning the vital interest of the State in linking the geographical area from which a trial judge is elected to his jurisdiction. The witnesses all testified that there is such an interest but there is nothing in the record to precisely explain what that linkage is, except that all of the witnesses agreed that larger districts are better than smaller districts in judicial elections. They also all agreed that popular election of judges has already produced a judicial system where the perception of "hometown" justice prevails. Witness after witness advocated merit selection over popular election.

This court must conclude, on the basis of the entire record, that no such vital State interest precludes a finding of Section 2 violations.

This court is unaware of what the **LULAC** record shows regarding the State's interest in linking the geographical area from which a trial judge is elected to the court's jurisdiction, but the court is fully aware that this record supports no such linkage argument.

**State Interest Affecting Remedy**

The State defendants also suggest that the same linkage interest precludes any change in electoral scheme for remedy purposes. Again, on the basis of the entire record, the court rejects that argument.

**Use of Subdistricts is Proper Remedy**

The State defendants argue that even if there are violations of Section 2 of the Voting Rights Act, creation of subdistricts as a remedy itself constitutes violation of that same Section 2. A powerful argument can and is made that for each subdistrict created, the voters in that subdistrict are deprived of the opportunity to vote in the elections of other judges who are elected by voters outside the subdistrict. For example, if a judicial district with four judges is subdivided into four subdistricts, each to elect one judge, each voter in each district loses three of the four votes be or she formerly had.

That is certainly one of the worst features of using subdistricts for judicial elections. It is one of the strongest

reasons this court has spent five years attempting to convince the parties that the solution to Section 2 violations was to change the system, not tinker with a few "guilty" judicial districts. The court failed in that effort.

However, **Thornburg v. Gingles** plainly shows that the Supreme Court does not find the concept of drawing subdistricts for election purposes to be inherently unfair or unconstitutional. There is no constitutional right to elect a certain number of judges. The one man one vote rule is inapplicable to judicial elections. **Wells v. Edwards,** 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973).

Given the federal imperative of imposing a remedy which will actually eliminate the vote dilution and the constraints upon federal courts which require observation of state policy, except to the extent necessary to eliminate the violations, this court again concludes that subdistricts present the only solution which satisfies all factors.

This court, in the June 12, 1990 ruling, reviewed in detail every proposal made as a remedy and concluded that each of them, except subdistricts, either required this court to change the system or would not actually eliminate the violation. Nothing was presented at the hearing August 19 - 21 which changed that conclusion.[4] The court finds itself in the same dilemma as in 1990

---

[4] Defendants' argument reasserting plurality vote by divisions provides no basis for reopening that door. As noted by Dr. Engstrom, the fatal flaw in such a remedy is that it has no reasonable assurance of being a workable alternative.

- proposals such as plurality voting simply will not eliminate the violations and proposals, such as merit selection, are beyond the court's authority.

The drawing of subdistricts does the least harm to the State's established policies and will most certainly correct the violations.

It is abundantly clear that the State of Louisiana has repeatedly divided judicial districts into smaller districts. The court has set forth some of the most recent legislation on a table, which is attached hereto as appendix "A." The State's own actions refute any argument that there is any actual State policy as to the size of judicial election districts. The smallest subdistrict which will be drawn as a remedy in this matter contains 13,000 people and is larger than three districts that have been created by the State.

There can be no dispute that "hometown justice" has no place in a judicial system. Undoubtedly subdistricts could be drawn so small as to be an unacceptable remedy. However, this is an abstract concept and there is the other side of the coin to be considered. The testimony presented by plaintiffs supports a finding that the present scheme is perceived to be manifestly unfair by minorities. The testimony of Judge Gibbs was

---

The suggested remedy of plurality without divisions causes all of the judges in a district to run against each other every election date. With divisions, a competent judge may be reelected without opposition. Not only does this promote stability or continuity within the judiciary, it minimizes "in house" disagreements. The elimination of divisions would result in judicial offices become more political than ever.

21

4905

particularly convincing; subdistricting may well result in an improved perception of the judicial system by a people of good will of all races.

Therefore, the court concludes that based on the record of this case that subdistricts are the least intrusive workable remedy.

## Violation of §2 in the Fortieth Judicial District

The court has carefully reviewed the additional election information presented as to the Fortieth Judicial District. At first glance, the recent election of Judge Jasmine appears to support a reversal of this court's findings on liability as to that district. However, upon closer examination, as testified by Dr. Engstrom, Judge Jasmine's election is the result of a culmination of unusual circumstances. The court is by no means persuaded that vote dilution has been cured in that district, particularly in view of the low percentage of cross over voting.

## Remedy - The Trial Courts

Plaintiffs and intervenors, the Louisiana District Judges Association, have entered a stipulation as to subdistrict lines and the divisions to be allocated to those subdistricts. The court hereby approves that stipulation and adopts it as the remedy at the trial court level.

Under the stipulation, elections will be held in only nine of the ten trial court districts. No sitting state judge will stand for election. The few minority judges will not stand for office.

22

The court adopts the notion of "ad hoc" or interim judges who will continue in office until death, retirement, resignation or the next regularly scheduled judicial election (1996). These judges may serve in their present districts or as assigned throughout the State by the Supreme Court of Louisiana. There are only six "ad hoc" or interim judges and all of their terms will expire no later than 1996. In a State which already has more than 200 judges, retaining these six experienced judges for up to six years is a slight financial burden upon the State. Moreover, it serves the desirable purpose of providing for a smooth transition into a violation free system.

No presently sitting State judge will be turned out of office, or be required to stand for election at this time, minimizing the shock to the State's judiciary.

**Remedy – Court of Appeal, First Circuit**

Unlike the trial judges, the Court of Appeal and plaintiffs have been unable to stipulate on subdistrict lines, the divisions to be assigned to subdistricts or anything else. The plaintiffs and the Court of Appeal do agree, however, that the concept of an interim or temporary judgeship, such as at the trial court level, is also essential at the Court of Appeal level.

In its brief, amicus curiae, the Court of Appeal points out:

> In the case of the appellate courts in Louisiana, it is clear that the state interests are weighted differently from those of the district courts. The terms of appellate judges are ten years; those of district courts are six years. The terms of appellate judges are staggered; those of district courts are not. The districts from which appellate judges are elected are

almost always larger than those from which district judges are elected. For its own reasons, the State of Louisiana has chosen to make the appellate judges less "responsive" to the electorate by lengthening their terms and enlarging their districts and to give them greater opportunity to be detached and objective. It has chosen to place in the court on which they serve a greater emphasis on continuity and stability; it has not made the same choice with respect to district judges.

This court certainly agrees that the factors enumerated are important. Staggered terms and continuity are very important factors at the appellate court level and this court will certainly observe staggered terms, as set by the State of Louisiana in the remedy.

The testimony of Judge Ellis and Judge Doherty is to the effect that use of larger Court of Appeal election districts enhances the detachment from local concerns which is desirable in an appellate judge. This court has no difficulty in accepting that notion, in principle, just as it was accepted at the trial court level, in principle. Here again, however, it cannot be said that Louisiana actually embraces and attempts to apply any cogent policy along those lines.

The First, Second and Third Circuit Courts of Appeal each have three election districts, each containing roughly three hundred thousand to four hundred thousand population and the Second and Third Circuits each have in addition an at-large district. The Fourth and Fifth Circuits are very different. The population of the election districts varies greatly.

The Fourth Circuit:

District 1      8 judges      496,938

District 2      1 judge        25,575

District 3      1 judge        66,691

At-Large        2 judges      589,144

The Fifth Circuit:

District 1      6 judges      448,306

District 2      1 judge        36,294

District 3      1 judge        46,139

If District 2 of the First Circuit is divided into four subdistricts, as proposed by Dr. Weber, each would contain some 95,000 people or nearly four times as many as District 2 of the Fourth Circuit and more than double most of the other small districts in the other circuits.

Thus, the creation of smaller election districts cannot be said, per se, to violate any enunciated policy of the State of Louisiana. It can hardly be argued that a subdistrict with a population of 95,000 is so small as to be subject to "local" pressure when compared to the 26,000 population of District 2 of the Fourth Circuit.

While the evidence has certainly established many desirable elements of a sound judicial system, the record in this case will not support the conclusion that the State of Louisiana actually follows any policy regarding the size of court of appeal election districts.

This court also notes that District 2 of the First Circuit consists of East Baton Rouge Parish, exactly the same election district as that of the trial courts, the Nineteenth Judicial District Court and the Family Court for the Parish of East Baton Rouge.

Under these circumstances, the court concludes that Louisiana itself has not observed any particular "linkage" of geographical area to jurisdiction at the Court of Appeal level on any consistent basis. Consequently, the court does not trample upon any vital state interest by creating one or more election subdistricts at the Court of Appeal level.

As noted above, Louisiana has established a policy in favor of staggered terms at the Court of Appeal level and in fashioning a remedy this court will adhere to that established policy.

Moreover, there being no current vacancy nor imminent retirement planned among the judges of District 2 of the First Circuit Court of Appeal, this court accepts the suggestion that none of these experienced judges[5] should be required to terminate a term early or to stand for election at this time.

As recommended both by plaintiffs and the Court of Appeal, the court will order that a fifth division be an interim or temporary judgeship. The fifth division, to be designated as Division E of District 2, of the Court of Appeal, First Circuit shall be elected at the elections scheduled in October, 1991 from the subdistrict

---

[5]One of those judges has limited experience at the appellate level but long experience at the trial court level.

26

drawn by Dr. Weber and designated as Subdistrict 2 on the map entitled "Defendants' Plan," containing the voting precincts as set forth in the document entitled "First Circuit, Second District Court of Appeals(sic) Defendants' Remedy Proposal, August 19, 1991." The term of office of Division E shall commence on January 1, 1992 and end on December 31, 2001.

The present judges of the other divisions of District 2 of the First Circuit Court of Appeal will continue to serve out their established terms of office. The interim Division E judgeship will remain in effect only until a vacancy occurs under Louisiana law by resignation, retirement or death (not by expiration of term) in one of the other divisions or upon creation of a new judgeship, whichever occurs first. This court is confident that at some time within the next decade there will be a vacancy from among those four divisions. When the first vacancy occurs, the judge serving in Division E will assume the letter designation of the vacant division and that division will then be assigned to Subdistrict 2 for election purposes.

The court has concluded that the subdistricts drawn for the Court of Appeal by Dr. Weber are superior to those proposed by plaintiffs, primarily because there is almost no population deviation from the "ideal" in Dr. Weber's proposal. Those proposed by plaintiffs contain significant deviation.

The Court of Appeal has also suggested the desirability of creating only two subdistricts, one a majority black district and the other for the election of all of the other judges of that

27

4911

district to the Court of Appeal.  Plaintiffs argue that creation
of such a "super subdistrict" would have the effect of placing some
sort of stigma upon the judge elected from the smaller subdistrict
and that the creation of such a subdistrict is prohibited by **League
of United Latin American Citizens  v.  Midland Independent School
District**, 812 F.2d 1494, vacated on other grounds, on Rehearing,
En Banc, 829 F.2d 546 (5th Cir. 1987).  That case involved election
districts for trustees of a school district.  As this court has
commented on several occasions and as the Supreme Court has
commented and as the Fifth Circuit has commented, there are
significant differences between judges and all other elective
offices, school board, State Legislature, municipal governing body
or whatever.  This record is replete with evidence of the
desirability of larger election districts for appellate judges.
While this court has noted the absence of a coherent Louisiana
policy in this regard and the court in no way considers an election
district with a population of 95,000 as "small," the court does
conclude that creating only two subdistricts would be the least
intrusive action which would remedy the Section 2 violation.
Accordingly, Subdistrict 2 will be the district drawn by Dr. Weber
and Subdistrict 1 will be the remainder of District 2 of the Court
of Appeal, First Circuit, from which Divisions A, B, C and D will
be elected.

**The State's Motion to Stay**

The State defendants move to stay the order of the court which
directs that judicial elections by sub-election district proceed

28

in eleven district, family court and court of appeal districts in October, 1991.

As previously noted, the Supreme Court recently remanded this action to this court for further consideration in light of the court's rulings in **Chisom v. Roemer** and **League of Latin American Citizens v. Clements (LULAC)**. This court has found, for the third time, that Louisiana's popular electorial scheme for State district, family court and court of appeal judges violates Section 2 of the Voting Rights Act of 1965.

The motion for a stay of judgment on behalf of defendants suggests that this court should delay implementation of any remedy because the **LULAC v. Clements** case is pending before the Fifth Circuit at this time and particularly in view of the "questions for counsel" issued by the court to counsel in that case.

When the en banc **LULAC** decision came down, this court vacated its prior injunctive orders and allowed the regularly scheduled Louisiana judicial elections for 1990 to proceed. Louisiana has elections for governor and other (non-judicial) officers already scheduled for October, 1991. The expense of adding judicial elections in the ten judicial districts involved will be negligible compared to the cost of scheduling special elections at some later date, particularly considering that the court does not order elections at this time except in the majority black subdistricts which have vacancies. Thus, there will actually be elections only in ten judicial districts. Special elections will be held in eight district courts, one family court and one court of appeal district,

29

4913

for a total of eighteen offices. The elections already scheduled include governor and all other state-wide offices, both houses of the Legislature and many local governmental elections state wide.

It has been suggested to the court by some of the many amicus briefs filed in this case that, at the time the October 1990 elections were held, the governing law was the en banc decision in **LULAC**, holding that Section 2 of the Voting Rights Act does not apply to judicial elections. The argument continues that, since those elections were then lawful, the results should be allowed to stand, thus postponing any remedy until the end of the terms of office of those who were elected in 1990 and earlier. As noted, this ruling does not shorten the term of any elected Louisiana judge.

**The Pending LULAC Case**

For reasons which are set forth at length in this court's rulings dated August 15, 1988, June 12, 1990, those orally delivered August 21, 1991 following the evidentiary hearing and the newly entered findings of fact and conclusions of law, the court rejects the notion that the State has a greater interest in linking election district and geographical jurisdiction in judicial election districts than in ridding judicial elections of minority vote dilution which violates federal law.

The court has obtained a copy of the "questions for counsel" issued by the Court in **LULAC** and has examined them. It is clear that this court has previously considered all of those issues except question No. 1 (the standard by which the appellate court

4914

should review the district court's findings) and this court has reconsidered those issues on the additional evidence received. In this court's findings of August 15, 1988 and June 12, 1990, all those issues were considered and discussed, although not, perhaps, in the precise language used by the Fifth Circuit. The previous findings of violation ("liability") have been reaffirmed upon consideration of the additional evidence and review of the **LULAC** and **Chisom** opinions of the Supreme Court.

**General Equitable Principles Favor Prompt Relief**

**Reynolds v. Sims**, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) teaches that:

> In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. . .

377 U.S. at 585, 84 S.Ct. at 1394.

Some years ago in **Wallace v. House**, 377 F. Supp. 1192 (W.D. La. 1974), **aff'd in part, rev'd in part**, 515 F.2d 619 (5th Cir. 1975), **judgment vacated** 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), **aff'd** 538 F.2d 1138 (5th Cir. 1976), **cert. denied**, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977), Judge Dawkins, when faced with vote dilution in a municipal governing body noted:

> [T]his Court and other District Courts have found that where a governing body has been elected under a malapportioned plan, or an election scheme such as at-large elections, cancelling out the voting strength of a cognizable portion of the populace, thus denying them access to the political process, prompt new elections are appropriate.

377 F. Supp. at 1201.

31

Federal courts have ordered special elections to remedy violations of voting rights on many different occasions. **See, e.g., Toney v. White**, 488 F.2d 310 (5th Cir. 1973).

Judge Dawkins dealt with a constitutional violation in **Wallace v. House, supra.** No constitutional issues have been addressed in this case, although plaintiffs have pled them. This court has preferred to deal with statutory violations only. That the vote dilution of minority voters has occurred in violation of a federal statute rather than in violation of the Constitution makes prompt new elections no less imperative.

This court orders special elections only in the majority black subdistricts having vacancies. Incumbent judges in majority white subdistricts will serve out their terms. Thus, the court recognizes the well known principle that any remedy imposed must be the least intrusive possible. Similarly, the court will not require the few minority incumbents in minority subdistricts to campaign at this time.

In ordering that elections be held in the majority black subdistricts, this court considers that the following factors favor immediate remedy:

1. The State has elections already scheduled for October 1991 and the cost of adding these few elections is negligible in comparison to the cost to holding special elections at some future date.

2. This action was commenced by the plaintiffs on July 1, 1986 - more than five years ago.

3.    After its 1988 finding of liability this court delayed about a year and a half to allow the State Legislature and other State officials time to fashion a remedy. The State has failed to do so.

4.    The next regularly scheduled elections for trial judges are at least five years away. This is the third time that this court has made findings of violations of Section 2 of the Voting Rights Act in these eleven judicial districts and plaintiffs have yet to obtain any remedy.

5.    But for the - as it turned out - erroneous decision of the Fifth Circuit in the **LULAC** case, these plaintiffs would already have their relief, because the subdistrict elections would have been held at the regularly scheduled judicial elections in 1990.

6.    All of the candidates in the 1990 elections were either judges or lawyers and all were aware of these proceedings and of the rulings of this court.

7.    All candidates were also aware that neither the **LULAC** case, the **Chisom** case, nor this case were final rulings and that the Supreme Court might reverse the Fifth Circuit's **LULAC** decision, as it did.

8.    With deference to the majority in the Fifth Circuit en banc **LULAC** decision, no knowledgeable lawyer or judge, federal or state, in Louisiana was surprised by action of the Supreme Court in **LULAC**.

9.    All who became candidates in the 1990 elections took the chance that the Supreme Court would reverse the Fifth Circuit's decision in LULAC.

10.    By virtue of the stipulation between plaintiffs and the Louisiana District Judges Association, intervenor, which is approved by the court, no incumbent State judge will be required to stand for election at this time.    All will be allowed to serve out their full terms.    This situation may not exist at a future time.

11.    The record before this court does not support any "linkage" argument as to either "liability" or remedy.

Those factors favoring delay:  NONE.

This court is aware that district courts ought not to go leading the charge into new and uncharted legal waters when there is pending circuit court authority which might be applicable. These are not new and uncharted waters for this court, however. There are differences between this litigation and the LULAC litigation although there are, of course, many similarities. There is some chance that the Fifth Circuit might find some "linkage" argument persuasive in the LULAC case.  This court, upon the record before it, is firmly convinced that there is no basis for using the "linkage" argument to impede this court's findings on either liability or remedy.

The plaintiffs won their case on the facts and the law in 1988, won it again in 1990 and again in 1991.    They have been waiting for relief ever since then.    This court can find no

reasonable cause for further delay in granting relief and, in view of the nominal expense to the State requiring the addition of these elections in October of 1991 is appropriate.

Accordingly, the motion to stay proceedings pending appeal is hereby DENIED.

There will be judgment in favor of plaintiffs as set forth herein.

Baton Rouge, Louisiana, August 29, 1991.


JOHN V. PARKER, CHIEF JUDGE
MIDDLE DISTRICT OF LOUISIANA