## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT LOUISIANA

JANICE CLARK, *et al*,                                   CIVIL ACTION 3:86-cv-00435
      Plaintiffs,

DONALD R. JOHNSON,
      Plaintiff-Intervenor

TRUDY M. WHITE,
      Plaintiff-Intervenor

GIDEON T. CARTER, III,
      Plaintiff-Intervenor

      Versus

                              Judge John W. deGravelles
JEFFREY "JEFF" LANDRY, *et al*.,                 Magistrate Judge Scott W. Johnson
      Defendants

---

### PLAINTIFFS' SUBSTITUED MEMORANDUM
### IN SUPPORT OF FRCP 60(B)(5)
### MOTION FOR REVIEW AND VALIDATION OF REMEDY RELIEF FROM
### JUDGMENT[1]

## I.  INTRODUCTION AND STATEMENT OF THE CASE

Original Plaintiff Orscini L. Beard, Plaintiff-Intervenor and Class Member Donald R.

Johnson,[2] Senior Judge of the 19th Judicial District Court ("Judge Don Johnson"), Plaintiff-

Intervenor and Class Member Trudy M. White, retired Judge of the 19th Judicial District Court

("Judge Trudy M. White), and Plaintiff-Intervenor and Class Member, Gideon T. Carter, III,

Attorney at Law, licensed in the state of Louisiana and practicing in the Parish of East Baton

---

[1] Judgment refers to, incorporates, and adopts all of the relevant judgments and orders rendered herein, to include the final judgment rendered in this matter, on remand, entered April 17, 1992 (See Record Doc. No. 665); along with the record of the Consent Decree pursuant to settlement.

[2] Senior Judge Donald R. Johnson, Retired Judge Trudy M. White, in their individual capacity, and Attorney Gideon T. Carter, III moved as former candidates in elections for judgeships in District 2 and as direct representatives of affected parties to intervene in this action. The Motion was filed concurrently with other motions and is currently pending before this Honorable Court.

Rouge, (hereinafter most times collectively referred to as "Plaintiffs") by and through the undersigned counsel bring this Motion to this Honorable Court to:

1) Immediately review this Court's remedial subdistrict model, evaluate dynamically updated information about the "quantitative fairness"[3] effect of the current remedy, the Defendants' blind indifference, or intentional disregard toward relevant data and facts, or their dismissive attitude toward the standards and effect of the enabling parameters of this Court's remedial judgment, and their ongoing refusal to redress actionable vote dilution and race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment to the U.S. Constitution; Section 2 of the VRA, and all other applicable federal and state laws in elections to District 2 of the First Circuit Court of Appeal of Louisiana;

2) Summarily revalidate and apply District 2's basic underlying four single-member district measures and metrics; and thereafter enter an order to restructure this Court's Section 2 remedy to provide, at a minimum, either a two-member majority-minority subdistrict in District 2, or by adding a second majority-minority single-member district inside Subdistrict 1, District 2; and

3) Grant additional specified relief and general equitable relief orders, relying on the remedial authority of the Court, consistent with the purpose of the judgment and the unique circumstances of this case.

This Honorable Court on June 12, 1990 predicted subsequent remedial measures would be necessary for the First Circuit Court of Appeal, District 2's subdistricts (that is, the geographical territories inside East Baton Rouge Parish from which judges are elected), amongst other courts, when it stated they would "need adjusting again in the future."[4] Extensive delays in reaching a

---

[3] See page 17 of the transcript of record of a portion of the testimony of Dr. Ronald E. Weber before the Honorable John C. Parker (sic), Chief Judge, Presiding, Tuesday, February 13, 1990. M.D. No. 86-435-A.
[4] See Findings of Fact and Conclusions of Law Remedy Phase, page 3, M.D. No. 86-435-A dated June 12, 1990.

curative decision to adjust this Court's Section 2 remedy and to provide for future case management of this Court's judgment would deserve the cause of justice and be detrimental to the public interest.

The Louisiana Legislature is responsible for drawing the boundaries of all of the state judicial districts. Under ordinary circumstances, this Court could simply delay its decision, offering ordinary procedures to the Defendants and deference to the Legislature lawfully to restructure the subdistricts of District 2 of the First Circuit. As this Court assessed in 1990, once more "these are not ordinary circumstances, however".[5]

Although Plaintiffs requested in their original motion and memorandum expedited procedures and proceeding, such process was not afforded prior to the promulgation of the new state election certification for the election just held November 5, 2024 for the office of Judge, Court of Appeal, District 2, Subdistrict 1, Division C. State certification regarding that election has been issued to 19th Judicial District Judge Kelly Balfour. He has or is expected to assume office January 1, 2025.

Shortly after formal service of Plaintiffs' original motion and pleadings, Defendants' counsel contacted Plaintiff's counsel and requested additional time to respond to Plaintiffs' motion, memorandum, and exhibits. This Court granted Defendants' motion and their response is not due until January 24, 2025.[6]

This motion for remedy review presents two simple, but important equitable relief issues for prompt resolution by this Court – preventative election measures, and retroactive curative and prospective remedial relief measures – because "[f]lexibility is often essential to achieving the

---

[5] See Findings of Fact and Conclusions of Law Remedy Phase, page 2, M.D. No. 86-435-A.
[6] See Record Doc. No. 76; Order signed November 12, 2024.

goals of reform litigation"[7] in that the current court-enforced two subdistricts' single-member-based structure of the remedial model of electing judges to District 2 deprives Plaintiffs and the two classes they represent of equal protection of the laws. The remedial model now violates the Fourteenth and Fifteenth Amendments of the United States Constitution, and the Voting Rights Act (VRA). As applied and enforced, the remedy, as maintained violates the intent of this Court's judgment in that it no longer rationally bears any logical relationship to its remedial and curative purpose.

**Decoding The Court's Subdistrict Remedy**

Decoding this Court's Section 2 remedy and implementing a new model requires a retrospective review, extrapolation and understanding of the basic structure of the two-subdistrict model, which, this Court mandated to remedy Defendants' violations of the VRA. This Court's judgment has eight core factors. The factors are capable of being assessed every census period to ascertain to how they are performing. The need for entrenchment of factors was more broad-based in terms of their coordinate remedial benefits than simply the judgment itself.

The terms of the existing two-subdistrict remedial judgment supporting this Court's remedy were established by this Court's textual adoption of the Defendants' expert's four single-member based subdistricts plan. The single-member structure is integral to the "fairness" part of the enabling eight factors that motivated the two-subdistrict model adopted by this Court. District 2 has one basic standard when it comes to complying with the Court's fairness requirement – equipopulous subdistricts. This Court and the Defendants have been explicit in this regard.

---

[7] *Chisom v. Landry*, citing *City of Boerne*, <u>659 F.3d at 437</u> (quoting *Rufo*, <u>502 U.S. at 381</u>).

A map of District 2[8] (i.e., East Baton Rouge Parish) of the First Circuit and its foundational electoral four single-member equipopulous subdistricts judicially adopted by this Court is shown below:



---

[8] This map is a colorized version of both the black and white, and the colorized version of the map filed into record and adopted in 1991 by this Court in the remedy phase. Defendants' Dr. Ronald E. Weber's subdistrict plan and map are filed into the record of this case. Record Doc. No. 634-2 identifies the map. It is described as Attachment B to the Defendants' Remedial Plan. See also Exhibit 11. The plan can be found in Louisiana District Judges Association's Post-Trial Brief as Appendix F.

Illustrated above, single-member subdistricts 1, 3, and 4 form Subdistrict 1 of the existing majority-white two-subdistrict model adopted by this Court from which three judges are elected in staggered terms for Divisions, A, B, and C. Subdistrict 2 is the actual African American[9] subdistrict adopted by this Court from which one judge is elected for Division D.

The question of whether the current circumstances surrounding the existing remedy is such that the judgment needs interpretation or modification to remain correlated with and logically related to its purpose. This is why it has become necessary to impose subsequent remedial measures for a new and more effective remedy in this case because the likelihood of the original violation has returned.

Interpretation of the remedy revolves around a review of a handful of this Court's court-imposed subdistricting criteria. Modification[10] of the remedy is required by the text of the judgment, supported by the permanent injunction,[11] Section 2 and Section 5 of the VRA curative measures, and current circumstances. Louisiana was a previously preclearance covered jurisdiction under Section 5 of the VRA from November 1, 1964 until June 25, 2013[12]. As applied in this case, both fashion the necessity for an updated remedy for the specific federal violations in this case, which will actually work and assure fair electoral outcomes.

The role of the court is to set standards of justice particularly in remedial phases. For the purpose of this Motion, the history that Plaintiffs see as most relevant is the remedial history, both pre and post this Court's 1991 judgment. Lack of adherence to the extensive history of and the thorough record in this case, binding precedent of then-Chief Judge John V. Parker's basic

---

[9]    "African American" terminology is interchangeable with "Black". See https://www.archives.gov/research/catalog/lcdrg/appendix/black-person
[10] See Findings of Fact and Conclusions of Law Remedy Phase at page 49 dated June 12, 1990. M.D. No. 86-435-A.
[11] *Clark v. Edwards*, 725 F.Supp. 285, 303 (M.D. La. 1988).
[12] See https://www.justice.gov/crt/jurisdictions-previously-covered-section-5

remedial subdistricting standards, and this Court's forecasted shifts in population and in demographic data have produced, as early as 2000, recurrent violations of specified aspects regarding this Court's judgment as to District 2, necessitating the following relief measures.

**Preventative Election Relief**

a) Set an immediate scheduling order or status hearing to establish an expedited and streamlined scheduling order to challenge or validate evidentiary aspects of this motion and to resolve the legal issues raised in this Motion and Memorandum;

b) Immediately enter an order appointing a court expert to provide analysis of African American voter dilution effects in all judicial elections for District 2, Subdistrict 1 since this Court's August 1991 judgment;

c) Declare all elections in District 2 Subdistrict 1 since 2010 are in violation of this Court's Findings of Fact, Conclusions of Law, and Equipopulous Subdistricts Judgment; and

d) Declare all elections in District 2 Subdistrict 1 since 2010 unlawfully dilute African American voting strength and result in the denial of Plaintiffs' opportunity to participate equally in the electoral process and to elect judges of their choice, in violation of this Court's Judgment, Section 2 of the Voting Rights Act, 42 U.S.C. 1973, and the Fourteenth and Fifteenth Amendments of the U.S Constitution.

**Retroactive and Prospective Remedy Relief**

a) Decertify commissions to offices for all elections held in District 2, Subdistrict 1's Divisions A, B, and C since 2010; and order new special elections under a revised remedial plan;

b) Enjoin the issuance of all future state election certifications for the offices of judge in District 2, Subdistrict 1 until further orders of the Court;

c) Order into effect a new election model for District 2 from either of the multi-member district plans or either of the single member district plans presented in this memorandum, which does not dilute African American voting strength and which upholds this Court's remedial judgment and Section 2 of the VRA;

d) Appoint a racially polarized voting analysis (RPV) and vote dilution expert to monitor voting and election events and make real-time recommendations to the Court to assure future compliance with this Court's Judgment and the VRA in District 2;

e) Appoint a technical advisor and promptly issue a remedy relief report regarding the effectiveness of the new remedial judgment after the 2030 federal decennial census; and

f) Order the parties to file a joint remedy status report on changes in this Court's subdistricting factors and shifts in population in District 2 with the Court within 60 days post promulgation of the 2030 federal decennial census.

Moreover, the then-existing municipal lines within District 2 (i.e., East Baton Rouge Parish) have significantly changed since this Court adopted as a rule Defendants'[13] plan and map as its remedial judgment on August 30, 1991.[14] Annexations to all of the then-existing municipals geography have occurred and two new municipalities have been created within District 2[15], concurrently with legally significant shifts in District 2 and its subdistricts' demographics, population, and voting-age population.

What's more, the lack of adherence to other remedial standards set forth in this Court's judgment has resulted in a regressive remedial subdistricting model. Compared to the original remedy, changes in District 2 now require minimally, either a two-member minority-majority subdistrict in District 2 or a second majority-minority single-member subdistrict in Subdistrict 1 remedy.

**Changes in Deviations and in Circumstances**

Deviation is the amount by which a single district's population differs from the ideal. As to District 2, deviation refers to the difference between the populations of the subdistricts. Several methods exist to measure the extent to which populations of all the districts in a plan vary, or differ collectively from the "ideal".[16] The method expressed in the paragraphs below is "relative overall range" deviation.

---

[13] See Dr. Ronald E. Weber's August 19, 1991 redistricting remedy proposal. M.D. No. 86-435-A as Exhibit 1. Exhibit 1 shows statistical summaries based on the 1990 Federal Census of Total Population Statistics, Voting Age Population Statistics, and East Baton Rouge's Voter Registration Statistics as of May 21, 1991.

[14] See Judgment dated August 30, 1991, M.D. No. 86-435-A, as Exhibit 2, at page 6.

[15] See Exhibit 14. District 2's progressive maps of boundary changes between 1990 and 2020.

[16] See https://www.ncsl.org/elections-and-campaigns/2020-redistricting-deviation-table; See also https://www.senate.mn/departments/scr/REDIST/Red2000/ch2equal.htm

This Court's two existing subdistricts (Subdistrict 1 and Subdistrict 2) have been allowed to remain in force on an assumption of four minimally[17] populated single-member districts – that is, without regard to "widespread"[18] deviations from the Court's minimal, other redistricting factors, and from the same complaint Louisiana utilized to dissolve the *Chiso*m. No astute reading of this Court's judgment can change the plain fact that one half of this Court's eight subdistricting remedial factors have not been sustained and thereby requires interpretation or modification.

The subdistricting factors are jurisprudentially established. The information surrounding and the empirical data supporting those factors cannot be refuted. Surely, it would be a travesty of justice to hold the Defendants responsible for violations of the factors without their knowledge. Notwithstanding, Defendants proposed the original remedial subdistrict standards and map adopted by this Court. Defendants are, or should be fully aware of their subdistricts, distinctive shifts in population and demographics in the subdistricts, and the circumstances described herein.

Defendants are estopped from asserting restrictions for culpability to redress Plaintiffs' harms. The Legislature has never submitted a remedial plan to this Court. The Defendants and the Legislature have a legal duty under the VRA not violate Plaintiffs' voting rights and electoral opportunities, and because of the judgment and permanent injunction, both have an obligation to speak up regarding the synchronous census changes, particularly the change in circumstances affecting District 2's subdistrict compliance with this Court's judgment.

The Legislature and the Defendants have knowledge of the municipal changes between 1990 and 2020 in District 2, and the transformative shifts in racial demographics starting with the

---

[17] See *Chapman v. Meier*, 420 U.S. 1 (1975) and *Conner v. Finch*, 431 U.S. 407 (1977) for discussion regarding deviations when a legislative redistricting plan is court-ordered.
[18] *Chisom v. State ex rel, Landry* No. 22. 30320 (5th Cir. Oct. 25, 2023).

2010 federal decennial census.[19] At that time, the white population of District 2 had become less than a majority (49%) and by the 2020 Federal Decennial Census, it had become 43%, with an African American population of 47%.[20] As Plaintiff's expert, Dr. Richard L. Engstrom, opined at the remedial trial before this Court, "I don't think we can continue to let white voters decide who judges are going to be and expect that to remedy vote dilution." (Transcript, February 15, 1990, p. 10).

Moreover, Defendants have an implied duty to notify the Court of changes in population and voting factors[21] affecting their obligations under the judgment to comply fully with the judgment. Likewise, Defendants have an implied duty to notify this Court of their "newest policy insights" regarding equipopulous factors affecting Louisiana judicial elections, such as "widespread" deviations, affecting their obligation under the judgment to assist them to comply fully with the judgment. However, it cannot be said in good faith that Louisiana actually embraces and attempts to apply its new cogent equipopulous policy to elections in District 2.

Candor from the Defendants requires (a) open acknowledgement of their pro-voting or anti-voting awareness of the adverse systemic changes affecting the power of Black voters and the success of Black candidates, especially in District 2's malapportioned subdistricts, (b) disclosure of the requesters and the reasons in 2010, 2011, and 2017 for asking the Louisiana Secretary of

---

[19] Decennial Census P.L. 94-171 Redistricting Data. Public records of the Louisiana Secretary of State reveal unidentified requestors asked for a copy for the *Clark* settlement documents in 2017, 2011, and 2010 where only the *Clark* Consent Decree was produced. In the Secretary of State's response, it was indicated that the map was not located in their files, and the records officer suggested that the requester will have to contact the U.S. District Court for the Middle District of LA to search their records for it. See also 2011 First Extraordinary Session Call Item #8 – Population bills in response to the 2010 census data at https://legis.la.gov/legisdocs/111es/call8.htm

[20] See Report Page 13 - East Baton Rouge Parish - Census 2020 - Total Pop and Voting Age Pop By Precinct.pdf at https://redist.legis.la.gov/2020_Files/Reports/Report%20-%20East%20Baton%20Rouge%20Parish%20-%20Census%202020%20-%20Total%20Pop%20and%20Voting%20Age%20Pop%20By%20Precinct.pdf

[21] See Report - East Baton Rouge - Registered Voters (12-26-21) at https://redist.legis.la.gov/2020_Files/Reports/Registered%20Voter%20Reports%20(12-26-2021)/Report%20-%20East%20Baton%20Rouge%20-%20Registered%20Voters%20(12-26-2021).pdf

State for a copy of *Clark*'s settlement documents, and (c) any information lacking adherence to the eight remedial factors upon which this Court's judgment is based.

As early as 2011, the Defendants, the Legislature and their presiding officers received Plaintiffs' specific demands for redistricting and malapportionment complaints, and were provided demonstrative evidence from African American elected officials and African American judges[22] through correspondence and testimony at legislative hearings that they were aggrieved by the continued enforcement of the unadjusted Court's judgment. Through a series of proposed amendments to present law[23], (*Clark v. Roemer*), the Louisiana House of Representatives heard its first District 2 redistricting hearing in March 2011. The Senate heard its first District 2 redistricting hearing in April 2022.

Black voters and Plaintiffs through direct action requested the following legislative bills to enact and statutorily codify a revised remedy to address the lack of Black judges on the First Circuit, and to redress the ongoing adverse effects of racial polarized vote dilution in District 2:

1. House Bill 40 filed March 27, 2011 in the First Extraordinary Session by State Representative Patricia Smith;[24] presented in the Judiciary Committee. Judges on the First Circuit supported the "concept" of an addition of a second minority judgeship as provided in the Bill; but resolved to oppose the Bill and to rely on the Judicial Council of Louisiana's[25] recommendation. The Committee did not advance the bill.

---

[22] See Exhibit 3. Correspondence from select Judges on the 19th Judicial District Court dated January 8, 2024.
[23] See the Digest reference in House Bill 40 (2011) and HB 518 (2019) and Senate Bill 353 (2022), SB 68 (2023), and SB 399 (2024).
[24] See House Bill 40 at https://legis.la.gov/Legis/BillInfo.aspx?s=111ES&b=HB40&sbi=y and presented before the Committee on the Judiciary at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2011/Mar_2011/0330_11_JU starting at time 6:41/1.23:12.
[25] See https://www.lasc.org/JudicialCouncil

2. House Bill 521 prefiled April 15, 2011 in the Regular Session by State Representatives Elton M. Aubert and Patricia Smith and presented in the House and Governmental Affairs Committee.

3. House Bill 518 filed March 29, 2019 in the Regular Session by State Representative Ted James;[26] presented in the Judiciary Committee.

4. Senate Bill 353 filed March 4, 2022 in the Regular Session by State Senator Cleo Fields;[27] presented in the Senate and Governmental Affairs Committee.

5. Senate Bill 68 filed March 31, 2023 in the Regular Session by State Senator Cleo Fields;[28] heard in the Senate and Governmental Affairs Committee.

6. Senate Bill 399 filed March 25, 2024 in the Regular Session by State Senator Cleo Fields presented in the Senate and Governmental Affairs Committee.[29]

The failure of the Defendants to support enactment of any of these six bills into law is evidence of systematic executive mistakes in leadership. The failure to enact any of these bills into law is likewise evidence of systematic presiding legislative mistakes. Violations of rationality is making the same wrong mistake; many mistakes is large enough to conclude an intent to maintain

---

[26] See House Bill 518 (2019) at https://www.legis.la.gov/Legis/BillInfo.aspx?s=19RS&b=HB519&sbi=y and House Video On-Demand of the bill presented on May 16, 2019 before the Committee on the Judiciary at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2019/may/0516_19_JU.

[27] See Senate Bill 353 at https://www.legis.la.gov/Legis/BillInfo.aspx?s=22RS&b=SB353&sbi=y and Senate Video On Demand Archive of the bill presented before the Senate and Governmental Affairs Committee on April 20, 2022 at https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2022/04/042022SG. Senator Fields returns in January 2025 to Congress consequent of the result of VRA litigation presently pending before the U.S. Supreme Court. See *Robinson v. Callais,* No. 24-110 WL 4654959 (Nov. 4, 2024).

[28] See Senate Bill 168 at https://www.legis.la.gov/Legis/BillInfo.aspx?s=23RS&b=SB168&sbi=y and Senate Video On Demand Archive of the bill presented before Senate and Governmental Affairs Committee on May 3, 2023 at https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2023/05/050323SGA

[29] See Senate Bill 399 at https://www.legis.la.gov/Legis/BillInfo.aspx?s=24RS&b=SB399&sbi=y and Senate Video On Demand Archive of the bill presented before Senate and Governmental Affairs on April 17, 2024 at https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/04/041724SGA2

the status quo in the lack of equal opportunity in election and is also evidence of (un)-"quantitative fairness" in District 2's election method.

Plaintiffs personally communicated with and perpetually asked through correspondence to state elected officials to redistrict District 2[30] in accordance with the VRA, pursuant to this Court's judgment, to no avail. Plaintiffs attempted in vain to achieve then-timely legislative amendments ahead of upcoming non-incumbent elections in open primary elections for the First Circuit. The Defendants and the Legislature have done nothing favorably since the 1991 judgment to overhaul their policies, practices, and procedures for electing District 2 judges regarding its adjudicated liability for violating the voting rights of District 2's African Americans.

As early as 2010, the Defendants and the Legislature were peculiarly aware of U.S. Census data, population trends and distinctive shifts in demographic data and information in District 2 regarding judicial electoral matters. They became aware of Plaintiffs' serial legislative bills and pleas from Plaintiffs regarding vote dilution and racial gerrymander claims.

Since this Court's 1991 judgment, Defendants' and the state Legislature's historical inaction (doing wrong, by doing nothing) and their non-responsiveness to Plaintiffs' demands and correspondences does little for their post-remedy legal and their good faith compliance standing and exposes any benign argument or irrational reason to oppose this motion. Any objection to application of the longstanding remedial precedent of this case would be hypocritical. Particularly, when contrasted with their pro-voting or anti-voting enactment action during the tenures of former Governor John Bel Edwards[31], then-Louisiana Attorney General Jeff Landry[32], now as

---

[30] See correspondence to Governor-Elect Jeffery M. Landry, Incoming House Speaker Phillip DeVillier and Senate President Cameron Henry dated December 21, 2023; correspondence to former Governor John Bel Edwards dated January 3, 2023; and correspondence to then-Attorney General Jeff Landry dated January 30, 2023 as Exhibit 4(A-C).
[31] 56th Governor of Louisiana from 2016 to 2024.
[32] 46th Attorney General of Louisiana from 2016-2024.

Governor[33], in this forum, and in other Louisiana political (that is, Louisiana's congressional, state legislative (senate and representatives), state supreme court, state public service commission, and state educational) during the 2024 redistricting sessions[34] and VRA cases.

The Defendants, contrary to their pro-voting action and declaratory position asserted in *Chisom v. Landry*, U.S. Court of Appeals for the Fifth Circuit, No. 22-30320 (2023)[35], and the Legislature have not provided to Plaintiffs, nor can they to this Court, any legally nondiscriminatory justification for maintaining and enforcing the "widespread" subdistrict population deviations existing in District 2 since 2010. Nondiscriminatory racial justifications examples include a) allowing representation to political subdivisions, b) compactness, c) preserving cores of prior districts, and (d) avoiding contests between incumbents. Neither has the Defendants stated any compelling racial justification to continue to enforce this Court's judgment as to District 2, Subdistrict 1, as is.

Thus, this Court's original remedial judgment requires revisiting for enforcement of a reconstructed subdistrict remedy. A recalibrated remedy is required as a result of this Court's lack of awareness of these historical events, the lack of juridical oversight of the adverse effect of ongoing racial polarized voting, the changes in District 2's municipalities (i.e., political communities), as well as distinctive shifts in population and race demographics, and in population deviations in District 2's subdistricts.

Moreover, Plaintiffs have also engaged in replete unsuccessful efforts to lobby the Louisiana Supreme Court,[36] Louisiana Legislature,[37] Louisiana Legislative Judicial Structure Task

---

[33] 57th Governor of Louisiana from 2014 to present.
[34] See Redistricting State of Louisiana at https://redist.legis.la.gov/default
[35] Filed September 19, 1986; Dismissed August 24, 2024.
[36] See correspondence to Louisiana Supreme Court dated October 11, 2023 as Exhibit 5.
[37] See correspondence to incoming Louisiana State Senators and Representatives dated January 8, 2024 as Exhibit 6.

Force,[38] First Circuit Judges Association,[39] Louisiana Legislative Black Caucus,[40] and others[41] to secure a legislative remedy to affirm their corrective-justice request and to redress the harms to them. Without judicial interpretation or modification of the Court's judgment, Plaintiffs will continue to suffer irreparable harm.

Consequently, Plaintiffs now petition this Court seeking a structural adjustment of District 2's remedial subdistricts, responsive to the 2020 federal decennial census population and voting-age data. Defendants have abandoned any fiduciary duty to District 2's African Americans under the judgment, the VRA, the Fourteenth, the Fifteenth Amendment, and the particular circumstances of this case to remedially investigate their claims, rigorously assess the harmful impact, and assess the historical supportive underlying rationale for subdistricts,[42] to determine a corrective course.

This Court's June 12, 1990 Findings of Fact and Conclusions of Law Remedy Phase established the mandated institutional reform measures and metrics for this Court to reinforce its judgment and to redress Defendants' inability or the Legislature's unwillingness to remedy ongoing violations of Section 2. This Court's judgment was a thoughtful and responsive court-ordered remedial subdistricting model. Its purpose was to afford relief from Defendants' past and prevent future violations of Section 2 of the VRA, and protect Plaintiffs' voting and electoral rights, and to provide an opportunity to equally and participate fairly in judicial elections.

---

[38] See correspondence to Chair of the Judicial Structure Task Force dated January 27, 2023 as Exhibit 7; see also Video of Plaintiff-Intervenor Judge Donald Johnson's testimony before the Judicial Structure Task Force on February 1, 2023 at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2023/feb/0201_23_JudicialTaskForce
[39] See correspondence to First Circuit Judges Association as Exhibit 8.
[40] See correspondence to Louisiana Legislative Black Caucus dated October 22, 2023 as Exhibit 9.
[41] See correspondence to Metro Council of East Baton Rouge dated October 26, 2023 as Exhibit 10.
[42] See Louisiana District Judges Association's Post-Trial Brief on Remedy Phase – Subdistricts Require a Consideration of One-Man One-Vote Principles filed March 5, No. 86-435-A as Exhibit 11.

This Court's remedy embraced a simple remedial model and math. It dealt with and was geared toward District 2 in which the at-large multi-member districts produced a Section 2 violation. The remedial objective was to cure past Section 2 violations and to prevent recurrent Section 5 violations through enforcement and maintenance of then-Chief Judge Parker's expressed single-member redistricting subdistricting criteria. As stated earlier, District 2 was functionally divided into four subdistricts[43] to cure the violations. The four single-member framework provides the analytic methods to safeguard the remedy and provides the lens through which this Court's two-subdistrict model is based and this motion is viewed. It is to be liberally construed, administered, and flexible to change.

This Court held that "Louisiana's history of racial discrimination, both de jure and de facto, continues to have an adverse effect on the abilities of its black residents to participate fully in the electoral process," 574 F. Supp. at 339. The Court also concluded that across most of Louisiana, and in several of the courts of appeal districts, there was consistent racial polarization in voting. That "history" since the enactment of the 1965 VRA did not include facts of unprecedented and extended misconduct by the office of then-Louisiana Attorney General William Guste **not to** enforce the VRA in Louisiana[44], who for 20 years, from 1972 to 1992, served as Attorney General of Louisiana, the state's longest serving chief attorney. That "history" also does not include recent VRA declarations by this Court against the state of Louisiana.[45] That history unfortunately continues to this day.[46]

---

[43] See Post-Trial Memorandum Submitted on Behalf of the Conference of Court of Appeal Judges of Louisiana, page 4, March 5, 1990.

[44] *Hall v. Louisiana*, Civil Action No. 12–00657–BAJ–RLB (M.D. La. 2015). See Record Doc. No. 288-6. Handwritten notes of First Assistant Attorney General, Kenneth C. Dejean, which was disclosed in discovery to the Plaintiff Hall's counsel.

[45] See *Allen v. State of Louisiana; R. Kyle Ardoin*, USDC No. 19-CV-479, *Robinson v. Ardoin*, No. 3:22-cv-00211-SDD-RLB and *Naire v. Landry*, No. 24-30115, 5th Cir.

[46] See *Robinson v. Ardoin*, 86 F.4th 574, 595-97 (5th Cir. 2023).

Defendants' and the Legislature's behavior toward District 2's Black voters and candidates for elections to the First Circuit lack good faith as shown by their repetitive and respective inactions to unstrap District 2's Black plurality in elections. They have neither a moral, reasonable, nor a legal compass not to adhere to federal law and this Court's judgments to reverse Louisiana's history on race discrimination.

At the remedial hearing in 1991, the parties stipulated at trial that the African American population in District 2 was sufficiently large and geographically compact to constitute a majority in at least one single member district when such court-ordered subdistricts would be created. It is expected the Defendants will stipulate that the African American population as early as 2020 in District 2 is sufficiently large and geographically compact to constitute a majority in a second single-member district as illustrated later herein in Exhibit 16.

Voting in District 2 elections and inside East Baton Rouge Parish[47] is and has always been racially polarized in judicial elections with white voters generally voting for white candidates and against African American candidates. As to District 2, subsequent to the filing of Plaintiffs' motion, additional research has revealed that as early as the year 2000, one-half of this Court's redistricting structural criteria has not been upheld. This Court has not been notified of any of these facts and their adverse effect on African American preferred candidates in District 2. The African American preferred candidates have not been elected in District 2's Subdistrict 1 since it was established by this Court in 1991.

---

[47] *Hall v. Louisiana*, 108 F. Supp. 3d 419 (M.D. La. 2015). See recent election results from the Court of Appeal election between white Judge Kelly Balfour and Black Judge Eboni Johnson-Rose (November 5, 2024) at https://voterportal.sos.la.gov/graphical; See also election results from East Baton Rouge Family Court election (November 18, 2023) between white Attorney Kyle Russ and Black Attorney Caulette "Twin" Jackson Guillard at https://voterportal.sos.la.gov/graphical: See also special primary and run-off election results from Baton Rouge City Court contest between white Attorney Carson Marcantel and Black Attorney Terrel Kent (November 13, 2021) at https://voterportal.sos.la.gov/graphical and the December 11, 2021 results at https://voterportal.sos.la.gov/graphical).

Moreover, District 2's relative overall population deviations amongst its four single-member underlying subdistricts substantially ascended from as close to zero; that is, from this Court's seminal remedial "minimum" deviation of **1.12**% (1990) – well below both this Court's subdistrict **5**% standard as well the U.S. Congressional **5**% standard of equal population and that of *Reynolds v. Sims*, <u>377 U.S. 533, 579</u> (1964) and *Gaffney v. Cummings*, <u>412 U.S. 735</u> (1973) for state legislative rebuttable presumptive safe-harbor measure of **10**% – to **24.01**% (2000) to **43.10**% (2010) to **64.81**% (2020) using federal decennial data without a rational court objective or state policy to exceed the Court's standard.

Additionally, District 2's relative overall population deviation between its two current election subdistricts (Subdistricts 1 and 2) also substantially ascended from as close to zero; that is, from this Court's seminal "minimum" of less than one percent, that is, **.91**% (1990) to **11.68**% (2000) to **23.52**% (2010) to **34.09**% (2020) using the same decennial population data, again without a rational court objective or legitimate state policy. All deviations in excess of this Court's "minimum" (i.e., plus or minus 1% or 5%) are inconsistent with and are per se violations of this Court's remedial judgment.

The scariest numbers are **64.81**% (2020) regarding the relative overall population deviation amongst District 2's underlying single-member Subdistricts 1, 2, 3, and 4 and the **34.09**% (2020) regarding District 2's relative overall population deviation between the current two-member Subdistricts 1 and 2 model. These astonishing figures show how far the districts are from the "minimum" populated subdistrict. These population deviations in the current plan are neither unavoidable nor are they *de minimis* to justify the state's heavy burden to explain their future maintenance to sustain their unadjusted enforcement of the status quo subdistricts.

The effect of these extreme population deviations amongst this Court's building-blocks from the "minimum" standard has produced retrogressive "quantitative fairness" consequences, which have unlawfully permitted the current subdistrict model to enable a white minority (**42**%) of District 2's electorate to elect **75**% (3 of 4 judgeships) of the judges in District 2. Any furtherance, maintenance, or enforcement of the present plan by the Defendants are the result of the lack of good faith to avoid Plaintiffs' efforts to achieve racial equality in electoral opportunity. Retrogressive "quantitative fairness" in these election subdistricts constitutes a significant change in the circumstances warranting an adjusted remedy to prevent the undermining of this Court's judgment.

Explained differently, District 2's current model structurally silences an African American plurality (**47**%) of the electorate to elect **25**% (1 of 4 judgeships) of the judges because of a dominant minority. Unless this Court restructures its subdistricting remedial model, African Americans will continue to be denied equal opportunity to participate as voters and as candidates in the electoral process in District 2.

With three post-census "widespread" deviation cycles in the books, District 2's map pursuant to this Court's judgment is permanently set – which means we will know the outcomes of the majority of the white plurality of District 2 elections before voters cast ballots in the next scheduled elections. The next regularly scheduled election for a District 2; Section 1 judgeship is five years away, 2030.

The Defendants and the Legislature did nothing to respond, let along redress Plaintiffs' renewed complaints of Section 2 violations. Nor did they undertake any pro-voting litigious action before this Court to remedy a violation, nor did they take any pro-voting action to adjust legislatively the population-based evidence disparities, which begin as early as 2000, nor did the

Governor promulgate an executive order to fulfil Louisiana's duty to District 2's Plaintiffs by adjusting the remedy pursuant to this Court's parametric remedial judgment.

As referenced above, District 2's relative overall population deviations amongst its four single-member underlying subdistricts substantially ascended from this Court's seminal remedial "minimum" deviation of .91% (1990) to 34.09% (2020), an increase of 37.45%. Among District 2's relative overall population deviation between its two current election subdistricts (Subdistricts 1 and 2) as referenced above, the deviation went from its seminal 1.12% (1990) to 24.01% (2000), an increase of 21.45%.

These increases in variance occurred in less than eight years after this Court rendered its final judgment establishing the existing court-ordered equipopulous election method. What is the Defendants' and what is the legislative rationale and effect for maintaining these statistically significant deviations on African American voting strength? Unreasonableness? Irrationality? Alternatively, something akin to a modern day Three-Fifths Compromise – disproportionate electoral participation?

How did this happen? Why did it happen? Lack of knowledge by the parties? Lack of notice to the Court? Lack of this Court's oversight of its redistricting criteria? Blind indifference? Alternatively, intentional disregard of the fact this Court mandated a remedial equipopulous redistricting criterion and doing wrong by doing nothing by the Defendants.

Alternatively, members of the Legislature's 2011-failed promise during the House Bill 40 and HB 521 hearings to work with Plaintiffs to redistrict the First Circuit; additionally, their 2021-failed promise to redraw its political districts?[48], exempting on March 11, 2022 all of Louisiana's

---

[48] See September 17, 2021 Joint Legislative Redistricting Website at
https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2021/sep/0917_21_HG_Joint; See also
https://mail.google.com/mail/u/0/#inbox?compose=new&projector=1

Courts of Appeal, particularly the First Circuit, especially District 2 from the 2022 Legislature's Call Proclamation[49]? At the time when they knew before and afterwards about Plaintiffs' VRA claims and the unique demographic and ecological changes in District 2.[50] Alternatively, after 2020, to maintain in full force and effect an impermissible racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment in a Black-plurality district. Impactfully, not to reconfigure Louisiana's First Circuit, District 2's four judgeship districts to meet an ideal size of 114,195 Baton Rougeans per district. At the time when 29 per cent of the population of the First Circuit identified themselves as Black to the United States Census Bureau, 61 per cent White and 10 per cent Other.

On the other hand, tactfully and exceptionally, the Defendants and the Legislature's decision to exempt District 2 from its "new policy insights"[51] particularly when obliged by the direct effect of this Court's parametrical precedential judgment requiring "minimal" levels of population deviation among "[a]ffected courts".

**Louisiana's "New Policy Insights" Regarding Judicial Malapportionment Requires Reexamination of the Original Judgment**

Plaintiffs' federal constitutional and statutory VRA rights must be protected again, particularly for District 2's Black Louisianans. This Court's enforcement of its judgment for the protection of Black voters and candidates must be safeguarded. The Defendants' recent transformation and revelation of, and desire, to adhere to "new policy insights" in state supreme

---

[49] See https://legis.la.gov/LegisDocs/221ES/call.pdf
[50] See Exhibit 13. Judge John Michael Guidry's (now Associate Justice of the Louisiana Supreme Court) letter dated December 23, 2021 to the President of the Senate, weeks ahead of the 2022 Legislative Redistricting Call Session for the state's political bodies. See S.B. 353 in March 2022. See S.B. 168 in March 2023.
[51]  See *Ronald Chisom, et al. v. State of Louisiana*, Case No.22-30320, particularly pages 27 and 28 (October 25, 2023), Fifth Circuit, United States Court of Appeal.

court judicial elections, but not this Court's insightful remedial equipopulous standard in redistricting District 2 are not arguably mutually exclusive.

Instead, when done right, they go hand in hand. That is why Plaintiffs are at the verge of yet another milestone with the Defendants' remarkable transformation while simultaneously seeking to achieve historic increases in Black lawyers and judges' opportunity to serve on the First Circuit is in the greatest public interest.

Plaintiffs' remedial motion follows a lengthy historical and jurisprudential record, and recitation outlining "widespread" abuse of Black voting rights through the application of race-based discriminatory practices exercised by the Defendants and the Legislature by maintaining enforcement of the existing structuralized voting method when they knew Blacks had become a plurality in District 2 in 2020. Although, the Defendants and Louisiana reluctantly make progress on improvements pursuant to the judgment, settlement and its obligations under the *Chisom* Federal Consent Decree, and its recent dismissal, they have selectively applied regressive redistricting polices preventing voting progress to Black voters and candidates in District 2.

Further pro-voting progress has not and cooperation likely will not voluntarily occur in this case, without another court order, recalibrating the 1991 subdistrict remedy. Louisiana's new Attorney General, responding only by way of an attorney general opinion, has suggested Plaintiffs course of action is to seek a declaratory judgment or other courses of action for remedial relief[52], which they untiringly now seek.

Louisiana should lead as a model by working with and safeguarding the voting and electoral rights of its District 2's Black Americans. A few days ago, Louisiana's Attorney General

---

[52] See Exhibit 15B.

expressed to the United States Supreme Court that "Louisiana is tired"[53] of defending various and varied voting rights cases, brought for and against it by its citizens. Louisiana District 2's Black voters and judicial candidates are "no ways tired" of illuminating inconvenient truths about our state and from seeking a state and a nation where just and equitable remedies are readily adjusted for recurring violations of their hard-earned civil and voting rights as equal citizens.

In this case, just like in *Chisom v. Landry*, No. 22-30320 (2023), nothing has prevented the Defendants from asking this Court or the Legislature, in good faith, from rectifying "widespread" malapportionment in District 2's subdistricts, as long as they comply with this Court's single-member structural-based remedy and the VRA. Louisiana has failed to comply, in good faith.

This Court's remedial judgment has been in full force and effect since its inception in 1991, despite the lack of critical juridical governance to adjust the subdistricts' boundaries due to modifications to and within in the remedial criterion for the District 2's subdistricts, as proscribed by this Court's Judgment. Unless interpreted, alternatively modified in accordance with this Court's established level of population equality across subdistricts, the judgment is no longer, sufficiently tailored for its intended purpose.

The current subdistrict model used mapping and data to provide predictive analytics for District 2's remedial subdistricts, which was largely based on the 1990 federal decennial census population and citizen-voting age data, and District 2's voter registration and turn-out data[54]. That predictive coding has been in action to assess and to prevent the risk of Defendants' recidivism using historical data.

---

[53] See page 54 of Louisiana's Brief in *State v. Callais, No. 24-109* and *Robinson v. Callais*, No. 24-110 pending before the U.S. Supreme Court.
[54] See Exhibit 1.

The Defendants' self-interests have not sensitized them to the needs of District 2's African Americans and the Legislature has not self-regulated their political preferences to statutorily effectuate and implement or amend La. 13:312 or 13:312.1[55] within this Court's parametric judgment or to comply with the VRA. Without a conversion in the Defendants' behavior toward enforcement of this Court's judgment or Section 2 of the VRA, or a modification of the remedy by this Court, the Court's current two-subdistrict model impermissibly (a) re-dilutes the voting strength of African American voters in District 2, (b) is equivalent to a new nullification system wherein a numerical racial minority of white voters elect a majority on District 2 over a plurality of African American voters, and (c) structurally discriminates on an ongoing basis of race to the disadvantage of historically disenfranchised African American voters and candidates in District 2 elections.

The present subdistricting model of electing judges in District 2's subdistricts as described above deprives Plaintiffs and the class[56] they represent of equal protection of laws in that the present system no longer rationally bears any relationship to the judicial remedial purpose of making District 2 accountable to the VRA, the Fourteenth and Fifteenth Amendments of the United States Constitution.

District 2's subdistricts, as a matter of law and the facts presented herein, are in recurrent violation of this Court's remedy. District 2 was, in 1991, and is presently in violation of Section 2 of the VRA as established in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986), and the existing subdistricts, as presently maintained and enforced, are in recurrent violation of the Court's remedy.

Consequently, Plaintiffs present herein a multi-member plan, which complies with this Court's two-subdistrict model as well as two illustrative single-member plans that easily meet the

---

[55] See https://legis.la.gov/Legis/Law.aspx?p=y&d=77438 and https://legis.la.gov/Legis/Law.aspx?d=77439
[56] See Findings of Fact and Conclusions of Law Remedy Phase at page 4 dated June 12, 1990, No. 86-435-A.

first precondition of *Thornburg v. Gingles*, <u>478 U.S. 30, 50-51</u> (1986). This plan is consistent with the curative findings of this Court[57]. Plaintiffs also illustrate herein that another majority-minority subdistrict can be drawn in District 2, inside of Subdistrict 1, what the racial composition in the subdistricts would be and how traditional redistricting principles would be respected.

Plaintiffs presented their first illustrative two-subdistrict plan to the Legislature in Senate Bill 168 (2023). The plan was re-presented the next year in Senate Bill 399. Defendants' expert, Dr. Ronald E. Weber, had opined in 1991, "it would be easier to work with the multimember subdistricts than with the single member subdistricts in the future if there has to be changes because of population changes, precinct changes, all the kinds of things that come up in the context of districting."[58]

Plaintiffs present herein their first illustrative single-member plan and map in Exhibit 12. The plan's relative overall range deviation is 2.66%. Plaintiffs illustrate another single-member plan using the East Baton Rouge's Family Court model presented in Senate Bill 400 (2024).[59] The plan's relative overall deviation range is .37%. Each redistricting plan easily comply with the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment to the U.S. Constitution; Section 2 of the Voting Rights Act; all other applicable federal and Louisiana Joint Rule 21 law.[60] Both sets of illustrative plans establish fair and effective minority participation.

As early as 2000, a real and actual controversy developed between the parties. An adjudicated undemocratically elected Legislature[61] cannot be expected to operate within democracy's guardrails to resolve the dispute between the parties. Plaintiffs have no remedy at the

---

[57] See Record <u>Doc. No. 633</u> filed August 29, 1991. Page 28.
[58] See pages 20-21 of a portion of the testimony of Dr. Ronald E. Weber before the Honorable John V. Parker, Chief Judge, Presiding, Tuesday, February 14, 1990. M.D. No. 86-435-A.
[59] See https://www.legis.la.gov/Legis/Billinfo.aspx?s=24RS&b=SB400&sbi=y. See Plan Statistics showing relative overall range deviation of **.37%** and the map of the four single-member districts.
[60] See https://www.legis.la.gov/Legis/Law.aspx?d=1238755. Louisiana Joint Rule 21 effective June 11, 2021.
[61] *Naire v. Landry*, No. 24-30115, U.S. Court of Appeals for the Fifth Circuit.

Legislature. Plaintiffs are suffering irreparable and material injury because of the non-population-balanced subdistricting elections occurring in District 2, and those elections will continue unless enjoined by this Court.

**HISTORY AND PROCEDURAL FACTS**

Section 2 of the VRA is fundamental to promoting fair representation in our democracy. This landmark case was decided 33 years ago. In the late 1980s, there were two vote dilution cases brought under Sections 2 and 5 involving state court judgeships in Louisiana [*Clark* and *Chisom v. Roemer*, 501 U.S. 380 (1991)]. The goal of these cases was to integrate the state court bench in Louisiana. Louisiana elections use the majority-vote system. All candidates compete in the same primary, and a candidate can win the election outright by receiving more than 50 percent of the vote. If no candidate does, the top two vote recipients from the primary advance to the general election, regardless of their partisan affiliation. The *Clark* case *sub judice* challenged the method of electing judges to the State District Courts, Family Courts, and Courts of Appeal, which is the subject of this action. The other suit was a similar challenge involving the method of electing justices to the Louisiana Supreme Court. *Chisom v. Roemer*, 501 U.S. 380 (1991).

Plaintiffs bought this suit in 1986, at that time there were and still are five circuit courts of appeal in Louisiana. Each of the five courts of appeal are divided into separate districts. In those districts that contain more than one judge, the judges are elected through at-large voting from the entire district. In addition, some of the circuits have judges who are elected at-large from the entire circuit. Plaintiffs originally asserted that the at-large method of electing judges to the First Circuit impermissibly diluted minority voting strength, in violation of Section 2 of the VRA, and the Fourteenth and Fifteenth Amendments of the United States Constitution.  Plaintiff later amended their complaint, adding Section 5 claims.

At the time, there was only one African American attorney serving on the Court of Appeal, who was elected in 1984 from District 1 of the Fourth Circuit. The Fourth Circuit, District 1 is composed of Orleans Parish only. Therefore, at the time of the judgment, no African American had served on the First Circuit.

### History of the First Circuit Court of Appeal[62]

The present structure of the First Circuit was created by Louisiana Act No. 561 of 1958, which amended Article 7, Section 21 of the Louisiana Constitution of 1921. Intermediate courts of appeal were first established in the Louisiana Constitution of 1879. At that time, East Baton Rouge Parish was assigned to the Fourth Circuit. The First Circuit, as presently constituted, began operations in Baton Rouge on July 1, 1960 with five judges. Act No. 52 of 1975 established four court of appeal circuits and the subdivision of each circuit into three districts. Act No. 114 of 1975 increased the number of judges to nine, with three judges elected from each of the districts of the circuit by the qualified electors of each district, respectively. Act No. 661 of 1980 increased the number of judges to ten. Act No. 3 of 1981 increased the number of judges to twelve, with four judges being elected from each of the three districts, respectively.

The Louisiana Court of Appeal, First Circuit, is one of five circuit courts of appeal in Louisiana. The First Circuit consists of twelve judges and has jurisdiction over sixteen parishes in Southeastern Louisiana - Ascension, Assumption, East Baton Rouge, West Baton Rouge, East Feliciana, West Feliciana, Iberville, Lafourche, Livingston, Pointe Coupee, St. Helena, St. Mary, St. Tammany, Tangipahoa, Terrebonne, and Washington.

The First Circuit Courthouse is located in Baton Rouge, Louisiana. Since the foundation of Louisiana courts of appeal in 1879, **ONLY** two judges in the circuit serving District 2 have been

---

[62] See history of the First Circuit at https://www.la-fcca.org/index.php/history.html

African American. Both were elected from a subdistrict created by judgment of this Court entered on August 30, 1991 in this proceeding to remedy Sections 2 and 5 VRA violation. In 1992, a former District Court judge, Freddie Pitcher, Jr., won the election for the seat created by this Court's judgment and became the first African American judge on the First Circuit. In 1997, after Judge Freddie Pitcher, Jr. retired, John M. Guidry, was elected to the First Circuit, and became the second African American judge to serve on the First Circuit. Judge Guidry was re-elected to the First Circuit in 2010 and again in 2020. In 2023, Judge Guidry became Chief Judge of the Court. Since 1997, Chief Judge Guidry has been the only African American member of the First Circuit. The eleven (11) remaining judges have **ALWAYS** been white. The election of these two African American judges was made possible by this Court's judgment, which created the current subdistricts for election of judgeships for the First Circuit, District 2, providing for first-time equal opportunities to Black voters and candidates.

Substantively and procedurally, the Legislature has never submitted a remedy proposal to this Court[63], nor has it ever re-enacted La. R.S. 13:312[64] or 13:312.1[65] to codify statutorily any remedial method for elections to District 2 consistent with this Court's findings and judgment. For the remedy ordered by Judge Parker the First Circuit, District 2 was divided into two subdistricts. Subdistrict 1 consisting of Divisions A, B, and C (a white majority-majority subdistrict) and Subdistrict 2 consisting of Division D (an African American majority-minority subdistrict). As mentioned in the Findings of Fact and Conclusions of Law, these subdistricts were initially adopted based on "equality of population"[66] from federal decennial census information and voting data from the 1990s.

---

[63] See Findings of Fact and Conclusions of Law Remedy Phase at page 6, June 12, 1990. M.D. No. 86-435-A.
[64] See https://legis.la.gov/Legis/Law.aspx?d=77438
[65] See https://legis.la.gov/Legis/Law.aspx?d=77439
[66] See Findings of Fact and Conclusions of Law Remedy Phase at page 49, June 12, 1990. M.D. No. 86-435-A.

### A. Current Configuration of the Court

Today, the First Circuit is the largest populated circuit of the five circuit courts of appeal. East Baton Rouge Parish, which comprises the First Circuit, District 2, is the largest populated parish of all 64 parishes of Louisiana. The current sitting members of the First Circuit District 2, are as follows: Chief Judge John M. Guidry (Subdistrict 2, Division D) terms ends on December 31, 2032; Judge Christopher Hester (Subdistrict 1, Division A) term ends on December 31, 2030; Judge Hunter Greene (Subdistrict 1, Division B) term ends on December 31, 2032; and Judge Jewel E. "Duke" Welch (Subdistrict 1, Division C) term ends on December 31, 2024.

The Defendants, Louisiana's chief executives, the President of the Louisiana Senate, the Speaker of the House of Representatives, and members of the Legislature are keenly aware of racial polarized voting, over and under population in and malapportionment of the First Circuit and that changes are warranted to the existing structure of the First Circuit, especially District 2. *See* House Resolution Number 30 of the 2022 Regular Session[67]. Release of the detailed federal decennial census information since 2000, and particularly on August 12, 2021 revealed to them transformative population shifts via Public Law (P.L.) 94-171.

In addition, Plaintiffs' reference to distinct population "shifts," show the court-order plan currently does not provide proportionality in District 2 where Plaintiffs demand a new multi-member or a second single-member majority-Black district. Without an interpretation or modification via an update to the remedial judgment using current census data to revise the existing boundary lines, further enforcement of the existing method has and will continually produce an illegal racially gerrymandered electoral system in favor of a white minority. Moreover, the percent

---

[67] See Judicial Structure Task Force at https://www.legis.la.gov/Legis/ViewDocument.aspx?d=1278609

growth in the District 2's Black voting age population (BVAP) since 2010, not only justifies this limited expansion of race based redistricting, but also requires it.

The identity of current judges, judgeships, tenure, and race of the judges serving on the First Circuit, starting with District 2, in the order of service seniority in their electoral district is shown below.[68] Chief Judge John Guidry assumes office on the Louisiana Supreme Court, effective January 1, 2025, leaving the First Circuit without an elected Black jurist since this Court's judgment.

| Judge/Judgeship Districts 1, 2, & 3/Election Section/Division | Tenure | Race |
|---|---|---|
| John Guidry, 2nd, Sub-dist. 2, Division D | 1998 - Present | Black |
| Jewel E. "Duke" Welch, 2nd, Sub-dist. 1, Division C | 2004 - Present | White |
| Christopher Hester, 2nd, Sub-dist. 1, Division A | 2021 - Present | White |
| Hunter Greene, 2nd, Sub-dist. 1, Division B | 2023 - Present | White |
| Page McClendon, 3rd, Division B | 2002 - Present | White |
| Wayne Ray Chutz, 3rd, Division A | 2014 - Present | White |
| Allison H. Penzato, 3rd, Division C | 2017 - Present | White |
| Elizabeth P. "Beth" Wolfe, 3rd, Division D | 2020 - Present | White |
| Mitchell R. Theriot, 1st, 2nd District, Division B | 2012 - Present | White |
| Walter I. Lanier III, 1st, Elec. Sec. 2, Division A | 2019 - Present | White |
| Steven Miller, 1st, Division D | 2023 - Present | White |
| Tess T. Stromberg, 1st, Elec. Sec. 1, Division C | 2024 - Present | White |

Last Updated on Tuesday, January 30 2024. Effective January 1, 2025, Chief Judge John Guidry became a Louisiana Supreme Court Justice, leaving the First Circuit without an elected Black judge. Judge Kelly Balfour assumed or is expected to preside January 1, 2025, replacing retired Judge Jewel Welch.

---

[68] See https://www.la-fcca.org/index.php/judges.html

A map of District 2 with its current subdistricts (Subdistricts 1 and 2) is shown below:



Although the subdistricts adopted by this Court in the beginning cured Defendants' Section 2 and Section 5 VRA violations, the subdistricts, are now, in part, regressive, as maintained and enforced with blind indifference by the Defendants and dissonance from Louisiana's Legislature to subsequent shifts in population and demographics. Such inaction constitutes an adverse

31

inference of reckless disregard for a corrective-justice judgment and continued violations of Section 2 and the jurisprudential curative Section 5 preclearance effects.

## II.    LAW AND ARGUMENT

### A. Federal Courts Have Authority to Enforce Their Own Orders/Judgments

It is well established that a federal court has the inherent authority to enforce its own orders and judgments to make them effective and efficient. *Kokkonen v. Guardian Life Insurance Co. of Amer.*, 511 U.S. 375, 379-80 (1994); *see* also *Waffenschmidt v. Mackay*, 763 F.2d 711, 716 (5th Cir. 1985) ("*Courts possess the inherent authority to enforce their own injunctive decrees,*"); *Kokkonen*, 511 U.S. at 378-80 (explaining that the doctrine of ancillary jurisdiction or inherent power, "*recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them.*"). Courts have asserted this inherent authority (also referred to as inherent power or ancillary jurisdiction) to protect the effect and force of their decrees or to promote the interests of justice and fairness. *Id*. at 380 (ancillary jurisdiction may be asserted "*to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees*"); *Trade Arbed, Inc. v. African Express MV*, 941 F. Supp. 68, 70 (E.D. La 1996) (relying on such jurisdiction to reopen the case on plaintiff's F.R.C.P. 60(b)(6) motion based on breach of settlement agreement).

Pursuant to this Court's inherent authority, the Plaintiffs are requesting this Court to interpret, enforce and relieve them from past and prospective adverse effects of the Judgment issued on August 30, 1991, and made final on April 17, 1992, as the Plaintiffs are alleging that this Court should exercise critical scrutiny of its judgment and make provision for review of the subdistricts to eliminate the accumulated weight of the evidence of ongoing violations of Section 2. Federal courts have continuing power to modify their existing injunctions, including consent

32

decrees, when changing circumstances make it appropriate to do so. *LULAC v. City of Boerne*, <u>659 F.3d 421</u>, (5th Cir. 2024). "District courts must take a flexible approach to motions to modify consent decrees and to motions to modify or vacate institutional reform decrees." *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, <u>659 F.3d 421, 437</u> (5th Cir. 2011).

During the post-merits trial phase of the implementation and enforcement of this Court's remedial subdistrict model, this Court, under its inherent powers, is able to devise and provide remedies, measures, or resolutions for procedural gaps and glaring substantive gaps (failure to routinely adjust non-equipopulous subdistricts over time) in its remedy or omissions that become evident when its judgment fails to address the legal issues that have arisen.[69]

1. **Half of the Essential Eight Factors of the Remedial Judgment have Not been Sustained.**

Inasmuch as this Court found violations of Section 2 of the VRA, the Plaintiffs are requesting the Court assert its inherent authority and interpret the Judgment accordingly and find that the Defendants' unwillingness to restructure District 2 because of shifts in populations and demographics over time does not correlate with this Court's essential remedial factors and it has become necessary to redress violations of the standards enumerated in Judge Parker's remedial judgment.

In this Court's Findings of Fact and Conclusions of Law (pp. 52-53), Remedy phase, June 12, 1990), Judge Parker required the Defendants in subdistrict redistricting must utilize the following eight factors:

(1) All subdistricts must be compact;

(2) All subdistricts must be contiguous;

(3) Parish and municipal boundaries should be maintained;

---

[69] Felix F. Stumpf, Inherent Powers of the Court, NJC Press, 2008, page 3.

(4) Current parish precinct lines should be followed;

(5) Each subdistrict must be drawn using the existing number of judgeships;

(6) Deviation in population across subdistricts must be kept to a minimum;

(7) Gerrymandering to dilute minority voting strength must be avoided; and

(8) Packing or gerrymandering to concentrate minority voting strength in an attempt to achieve proportional representation must be avoided.

Since this Court's ruling some 33 years ago, the Defendants have neither notified this Court of legally significant demographic shifts in District 2's population nor have they notified this Court of the changes required to sustain adherence to the Court's judgment in several respects; namely, Defendants failed to hold themselves and the Legislature their selves to the enabling remedial election factors 3, 6, 7, and 8 above.

Plaintiffs acknowledge the Defendants reluctantly acquiesced to holding the initial and court-ordered elections in accordance with the enabling factors following the literal wording of the judgment. However, the Defendants have never acquiesced to holding any subsequent and court-ordered elections in accordance with the measures and math enabling factors of the judgment. Most importantly, after 36 years, the Legislature has failed as directed by this Court to submit any remedial plan, nor have they maintained compliance with the subdistricts' underlying essential four single-member design-divisions to comply with the judgment's minimal metric-based remedial requirements, nor have they adopted corrective revisions to remedy recurrent Section 2 violations.

It is a long-accepted general principle in voting rights cases that court deference is due to any plan proposed by the state Legislature. Notwithstanding, whenever the state refuses to resolve its own problems, this principle does not apply. This Court must enter its own remedy, as was done

here, in 1990, having no plan from the Legislature[70], "the Court found that the use of subelection districts was a proper method to remedy the violations of federal law."[71] After more than 39 years[72], the Legislature has forfeited any sovereignty compliant or waived any deference to have this Court to permit it now to present a plan

Additionally, Louisiana Senate Resolutions 235 through 239[73], inclusive of the 2021 Regular Session requested each of the five circuit courts of appeal to "submit recommendations for redistricting their election districts and sections based on the 2020 federal decennial census to the Senate no later than December 31, 2021. The First Circuit, pursuant to SR 239 on December 18, 2021 recommended "no" redistricting changes in the election districts and sections of the court. District 2's Judge John Guidry objected to his First Circuit colleagues' recommendation.[74]

### a) Factor 3. This Court has not been notified of then-existing (1991) municipal boundary changes since its judgment.

During the past three decades, the municipal boundaries inside District 2 have significantly changed. Since the judgment at issue herein, there have been two additional cities added within the parish, namely, the City of Central, and more recently, the City of St. George[75]. Although there were expansions in the then-existing municipal boundaries of East Baton Rouge Parish, the Defendants have not volunteered to assess any adverse effect on racial vote dilution these changes have in the First Circuit, District 2.

Municipal boundaries lines have changed.[76] All municipalities' (City of Baton Rouge, City of Baker, and the City of Zachary's) boundaries existing at the time of this Court's remedial

---

[70] See Findings of Fact and Conclusions of Law Remedy Phase, June 12, 1990, page 44. No. 86-435-A.
[71] Transcript of August 21, 1991, Judge John Parker, p. 66. M.D. No. 86-435-A.
[72] Record Doc. No. 633, page 33.
[73] See for example Senate Resolution 239 (2021) at https://legis.la.gov/Legis/ViewDocument.aspx?d=1234459
[74] See First Circuit Chief Judge Vanessa G. Whipple and Judge M. Guidry's letter dated December 23, 2021 to Senate President Patrick Page Cortez, as Exhibit 13 (A and B).
[75] See https://www.lasc.org/Opinions?p=2024-019
[76] See District 2 Boundary Map Changes, as Exhibit 14.

judgment have changed. Some of the then-existing municipal precincts changed or have been redrawn. Annexations have also occurred within all then-existing parish municipalities. Two new municipal boundary-norms were established since this Court's judgment inside District 2. The City of Central was established on April 23, 2005[77] with a population of 25,000. The City of St. George Transition District bill was signed into law on June 12, 2020. The city was legalized in a Louisiana Supreme Court judgment on June 27, 2024 with a population nearly 100,000. St. George[78] is East Baton Rouge's fifth city. District 2's precinct lines within the then-existing municipal boundaries lines have changed. Some of the then-existing municipal precincts changed or have been redrawn. Precinct changes are available on the Louisiana Joint Legislative Redistricting Website: https://redist.legis.la.gov under the Shape Files & Block Equivalency Files Section.

**b) Factor 6. This Court is unaware that population deviations have not been kept to a "minimum".**

When it comes to complying with this Court's subdistrict remedy, equal population amongst subdistricts is the rule. "Subdistricts drawn for the Court of Appeal by Dr. Weber are superior to those proposed by the plaintiffs primarily because there is almost no population deviation from the "ideal" in Dr. Weber's proposal."[79]

Deviations from the exemplar population amongst the Defendants' expert, Dr. Weber's, four foundational singe-member subdistricts plan adopted by this Court to remedy District 2's Section 2 violation permeates the Court's "standard of – what we call "quantitative fairness"; that

---

[77] See https://www.centralgov.com.
[78] See map of the city of St. George at https://web-ebrgis.opendata.arcgis.com/maps/b5bf83ce52794dc8bcf4126678b8a42c/explore?location=30.369912%2C-91.025255%2C12.05
[79] Supplemental Findings of Fact and Conclusions of Law, page 27; August 29, 1991. See also Memorandum Relative to Remedy Submitted by the First Circuit Court of Appeal, page 6, filed August 26, 1991, with Dr. Robert E. Weber's subdistrict plan, with precinct summaries attached. M.D. No. 86-435-A.

is to say, equality in population across districts or across subdistricts, so in any evaluation of a districting plan, one must begin with that basic evaluation criterion".[80]

Population deviations have not been kept "as equal as possible"[81]; that is, Dr. Weber's equipopulous standard for the basic evaluation criterion "plus-or-minus five percent of equal population for the overall plan"[82], so that no particular subdistrict should rise above five percent beyond population equality and no particular subdistrict should go below five percent in population equality.

Starting in 2000, federal decennial census data provide exemplar statistical evidence the deviation increased to 24.01%; to 43.10% in 2010; to 64.81% in 2020. Each set of deviation violated this Court's parametric variance factor in its judgment across the four single-member model. This evidence show extreme malapportionment among District 2's subdistricts under similar circumstances which the Defendants sought as the primary reasons they sought to dissolve or modify the Consent Decree in *Chisom v. Landry*. The Defendants' "quantitative fairness" expert in *Chisom*, Dr. Ronald E. Weber, is the same population equality-redistricting expert this Court relied on to design the subdistrict remedy entered in this case.

One year ago in October 2023, then-Louisiana Attorney General Jeff Landry asserted in pleadings before the United States Court of Appeals for the Fifth Circuit, that it was no longer equitable to enforce the Consent Judgment against Louisiana in *Chisom* because of "'widespread'" deviation in population amongst Louisiana's Supreme Court seven single-member districts. The relative overall deviation range using the 2020 decennial census data was **36.05**% for the Supreme

---

[80] See page 17 of a portion of testimony of Ronald E. Weber before the Honorable John C. Parker (sic), Chief Judge, Presiding, Tuesday, February 13, 1990. M.D. No. 86-435-A.
[81] The factor of equal population cannot be ignored per the judgment of this Court. See p. 53 of the Findings of Fact Remedy Phase. M.D. No. 86-435-A.
[82] See Dr. Ronald E. Weber's testimony during Remedy Phase, February 13, 1990, pp. 17-18. M.D. No. 86-435-A.

Court districts before the recent redistricting.[83] The First Circuit District 2's relative overall deviation reached **43.10**% in 2010 and as of the 2020 census amongst its four single-member foundational subdistricts is nearly twice (**64.81**%) that of its Supreme Court. The severity of the difference (64.81% – 36.05%) between the Supreme Court's district deviations and that of District 2 equals a non-*de minimis* **28.76**%. The severity alone is existential evidence of the dilutive result in District 2's African American voting power and requires judicial review. Descriptively, a per se violation of this Court's judgment.

This Court's empirical evidence of the lack of equipopulous specific variance amongst its four single-member subdistricts reveals District 2's African American population cannot rely on their Legislature or their state Defendants whose political color governs their inability to give Black votes equal weight. Such variance is avoidable and cannot be corrective-justice explained (i.e., preserving minority voting strength) nor justified by the state or the Defendants as necessary to achieve a legitimate state policy. This Court's judicial criteria prevents the state and the Defendants from deviating from equipopulous subdistricts for remedial measures and reasons approved by this Court.

Legally consistent with this motion but incongruently applied with the facts in and significant change in circumstances of this case, despite the prevalence of extreme numerical malapportionment in District 2's subdistricts, Defendants offer no legal action nor Legislative assurance to redistrict District 2[84]. Nor has the Legislature taken any pro-voting action to protect District 2's African American voting-age population to increase minority representation on District

---

[83] See population and percent deviations presentations regarding the Louisiana Supreme Court Malapportionment Chart at 58:58/1:13:13 at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2021/sep/0917_21_HG_Joint. See also Act 7 redistricting, effective May 1, 2024 at https://www.legis.la.gov/Legis/BillInfo.aspx?s=24RS&b=SB255&sbi=y

[84] See Exhibit 15 (A and B). Correspondences from the Honorable Elizabeth "Liz" Murrill, Attorney General of Louisiana dated February 28, 2024 and April 4, 2024.

2. By doing so, neither the Defendants nor the Legislature can be relied upon to protect Plaintiffs' interests, maintain legal compliance with this Court's judgment and the Voting Rights Act, and contribute to a fair and just election environment in District 2.

    **c) Factor 7. African American voting strength has been diluted.**

African Americans now make up a plurality of the population of the First Circuit, District 2, yet under the current subdistrict malapportioned subdistricts, African American voters' political power is structurally submerged to the effect that their opportunity to elect the candidate of their choice is less than whites. Consequently, only one out of four appellate judges in District 2 is African American. Consequently, only one out of 12 appellate judges on the First Circuit is African American.

Post this Court's 1991 judgment, when whites were the majority population in District 2, white judges occupied 75% of District 2's judgeships. In District 2, when whites become a plurality in 2020, white judges occupied and today continue to occupy 75% of the judgeships. Inversely, when Blacks became a plurality in 2020, Black judges occupied and continue to occupy 25% of District 2's judgeships. This is explained by the structural limitations imbedded in the original judgment, combined with the Defendants and Legislature's inactions to redress vote dilution, race discrimination, and minority-white rule in District 2 elections.

    **d) Factor 8. A packed subdistrict has been maintained and Black voting strength gerrymandered.**

Packing in this case is not allowing a second majority-minority district to be drawn in District 2 using traditional redistricting standards. Racial gerrymandering in this case is also maintaining District 2's current lines to give whites an unfair advantage over African Americans. Creating majority–minority districts to comply with the VRA is not racial gerrymandering.

Since 2020, the Legislature has strategically negated its legislative duty and this Court's jurisprudential duty, abandon its altruistic obligation or exercised irrational responsibility to prevent vote dilution of the power of District 2's African American voters by not unpacking them from Subdistrict 2 and by avoiding cracking of that voting power into the multimember majority-white Subdistrict 1 of District 2. The current Subdistrict map (that is, the boundaries and precincts) "packs" African American voters within District 2 into a single-member district (Subdistrict 2).

Aligning 2020 federal decennial census data within this Court's existing four single-member subdistrict model, uncloaks a second single-member African American majority district already exists in single-member Subdistrict 4.[85] In addition, an illustrative single-member African American-majority subdistrict can be configured inside of the existing multimember Subdistrict 1 using Joint Rule 21. By failing to adjust the remedy to account for the second majority African American district, the subdistrict map, as maintained and applied, dilutes District 2's African American's voting power, submerges that voting power in Subdistrict 1, and denies them an equal opportunity to elect candidates of their choice.

**2. There have been transformative population shifts in District 2.**

This Court concluded on page 12 of its Findings of Fact and Conclusions of Law Remedy Phase in this matter, which were issued June 12, 1990 "that equity demands that all such subdistricts—for whatever purposes created—must contain equal populations." Equitable powers were particularly judicious and admirably utilized by this Court in the remedial relief subdistrict model proposed by the Plaintiffs, as parametrically proscribed by, and adjudicated against the Defendants.

---

[85] See Exhibit 16.

So too does equitable consideration related to the interests of justice justify interpretation, modification of the original judgment and the specific relief requested by movants of this Court's remedy. A court's "general equity powers" refer to its authority under the principles of equity to issue injunctions allowing the court to prevent irreparable harm. Such general equity powers have been exercised to permit intervention, amendment, and supplemental complaints.

There have been significant shifts in District 2's population and demographics since the remedial judgment issued by this Court. As of 2020, East Baton Rouge Parish had a total population of 456,781, with an African American population of 46.7%. Of this total population, 42.9% are white, not-Hispanic; 46.7% are Black, not-Hispanic; 6.6% are Hispanic, and 3.5% are Asian not-Hispanic. As of 2020, East Baton Rouge's voting-age population ("VAP") was 355,612 of whom 46.08% were White, not-Hispanic, and 44.09% were African American, not-Hispanic. East Baton Rouge Parish had a total population of 366,191 when this case was originally decided and a total African American population of 114,741, which then constituted 30.3% of the population.[86]

As stated earlier, just a few years ago, the Legislature requested each of the five circuit courts of appeal "submit recommendations for redistricting the election districts and sections of the court based upon the 2020 federal decennial census to the Senate no later than December 31, 2021." JMC Analytics and Polling (JMC) provided redistricting analyses to the judges of the five circuits.[87] According to the report, there were noticeable demographic shifts in District 2. District 2 went from a 49-46% white plurality to a 47-43% African American plurality between 2010-2020.

---

[86] See Reasons for Judgment dated August 30, 1991, page 27. M.D. No. 86-435-A.
[87] JMC Analytics and Polling Appeals Court Analysis's (2020-2010) report is attached as Exhibit 17.

A detailed examination of District 2 shows that the minority subdistrict (Subdistrict 2) remained heavily African American (its African American majority barely changed, going from 70-26% to 70-24% Black/white between 2010 and 2020), but there was substantial demographic shift occurring in the white majority subdistrict (Subdistrict 1), causing its demographic mixture to go from a 55-39% white majority to a 47-41% white plurality between 2010 and 2020. More important legally and the most revealing information about the current make-up of this Court's four parametric single-member districts is that single-member Subdistrict 4 transformed into a majority-African American subdistrict between 2010 and 2020.[88]

Even with this available information, the Defendants failed to propose a modification to this Court nor has the Legislature revised the existing subdistrict boundary lines of District 2, consistent with its duty to protect its African American citizens from racial vote dilution, conduct tantamount to a per se violation of this Court's order.

The Louisiana House held its first District 2 redistricting hearing in 2011. The Senate heard its first District 2 redistricting hearing in 2023. In March 2011, State Representative Patricia Smith, relying on 2010 federal decennial census population, trend workload case filing data, and circuit court malapportionment, authorized legislation via House Bill 40 (2011) in an Extraordinary Call Session[89] to amend R.S.13:312.1(A) for an additional minority judgeship for the Court of Appeal for the First Circuit in the Second District to be elected from Subdistrict 2 to avoid minority voting rights litigation consistent with the judgment and history of the "*Clark v. Roemer*" litigation, particularly referencing paragraph B, Item 12 on page 6 of this Court's August 31, 1991 Judgment. House Bill 40 was involuntarily deferred as the Legislature failed to advance it.

---

[88] See also Exhibit 16, District Summary for single-member Subdistrict 4 data.
[89] In Louisiana, the Legislature acts through the introduction and passage of bills, the Governor may veto, and the Legislature may override the veto. The Legislature may also call itself into special session or introduce bills related to redistricting in the general session.

On April 15, 2011, attempting to address objections and arguments raised at the hearing against House Bill 40 (2011), State Representatives Elton M. Aubert and Patricia Smith jointly prefiled House Bill 521[90] in the 2011 Regular Session to redistrict and to reapportion the Court of Appeal for the First Circuit by providing changes to the geographic boundaries for election sections in the First and in the Third district to provide for the assignment of judgeships in those districts for election purposes.

Although, this Court mandated remedial metrics and measures to rectify the discriminatory method in District 2 elections to ensure that future elections reflect the true diversity of the Louisiana population, this amendment would have provided the opportunity to add two additional minority judgeships to the Court of Appeal, one from District 1 (first district) and one from District 3 (third district) to increase the number of African Americans to be elected to the First Circuit as a whole. On June 8, 2011, the bill was involuntarily deferred in House and Governmental Affairs Committee.

Although not directly related to House Bills 40 and 521 (2011), State Representatives Dalton Honore and Damon Baldone filed House Bill 582[91] (Regular Session 2011) seeking to reapportion and to create a single minority-majority subdistrict in the 32nd Judicial District (Terrebonne Parish), simultaneously addressing the concerns and issues raised in House Bills 40 and 521 referred to herein above. Although the bill was reported favorable out of the committee, it was defeated on the House floor. As noted above, the 32nd Judicial District Court is within the First Circuit.

---

[90] See House Bill 521 (2011) at https://legis.la.gov/legis/BillInfo.aspx?s=11RS&b=HB521&sbi=y. See House and Governmental Affairs Committee hearing at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2011/Jun_2011/0608_11_HG starting at time 10:06/4.01:39.
[91] See House and Governmental Affairs Committee hearing at https://www.legis.la.gov/Legis/BillInfo.aspx?s=11RS&b=HB582&sbi=y

Interestingly, during the same Regular Session 2011, Representative Eddie Lambert sought to redistrict the Louisiana Supreme Court to establish equipopulous districts when he filed House Bill 528[92] to reduce the "widespread" malapportioned seven districts, to no avail. The bill never advanced. If passed, the bill would have codified the relative overall deviation at 5.79%[93] among the districts.

On March 29, 2019, State Representative Edward "Ted" James, relying on federal decennial census population trend data and on governmental estimates within 1% of population and demographic shift in East Baton Rouge Parish (District 2), put direct focus on the Legislature to reapportion District 2, one year before the 2020 Census, and well ahead of the November 3, 2020 judicial elections to the First Circuit.

Representative James authorized legislation to amend R.S. 13:312.1. This amendment would have transferred one judgeship from Subdistrict 1 to Subdistrict 2 of District 2 to increase the opportunity for African Americans to be elected. HB 519 was referred to House Judiciary Committee but the Legislature failed to advance it.

Three years later, on March 4, 2022, State Senator Cleo Fields, utilizing the 2020 census population and demographic data, authorized legislation consistent with Joint Rule 21, to amend R.S. 13:312(1)(b) and 312.1(A) to redistrict District 2 by redrawing the electoral lines to provide for new election sections to increase opportunity to elect African Americans to the First Circuit. SB 353 made it out of Senate Committee on State and Governmental Affairs but was withdrawn on the Senate Floor as Senator Fields did not accept the unrelated amendments made on the floor.

A year later, on March 31, 2023, Senator Fields again, further responding to trend demographic shift in District 2, again put focus on adhering to this Court's judgment and shifting

---

[92] See https://legis.la.gov/Legis/ViewDocument.aspx?d=742057
[93] See HB 528 and redistricting Plan Statistics at https://legis.la.gov/Legis/ViewDocument.aspx?d=742057

state policy regarding the application of the "one-man one-vote" principle to redistrict Louisiana's Supreme Court's seven single-member districts authorized legislation consistent with Joint Rule 21 again to amend R.S. 13:312(1)(b) and 312.1(A) to draw the electoral lines for District 2 to increase minority opportunity to elect African Americans to the First Circuit ahead of the judicial election on November 8, 2023. SB 168 made it out of Committee on Senate and Governmental Affairs but was returned to the calendar on the Senate Floor as Senator Fields did not accept the amendments made on the floor.

On March 25, 2024 again, Senator Fields, authorized legislation consistent with Joint Rule 21 to amend R.S. 13:312(1)(b) and 312.1(A) to draw the electoral subdistrict lines for District 2 for a third time, months ahead of the November 8, 2024 judicial elections scheduled for the First Circuit on November 5, 2024. On April 17, 2024, SB 399 was reported favorably by the Senate and Governmental Affairs Committee, but the bill did not become law.

Between 2020 and today, the only elections occurring in District 2, Subdistrict 1 was the election of Chief Judge John Guidry in 2020. Defendants' inaction to redress recurring Section 2 violations has been under a microscope leading up to and after the 2020 census. African American voters, elected officials, and candidates have pleaded with the Legislature four times since 2019 to adjust the current judicial map of District 2, to no avail.

The Louisiana Constitution authorizes state legislators to modify the number of members on the First Circuit, La. Const. art. V, § 15(D), as well as to revise the districts used to elect members for the First Circuit, including by dividing District 2 into single-member districts, La. Const. art. V, § 15(B). The Legislature long ago abandoned their sovereign responsibility; and as the Defendants have not thought soberly since 2010, to join with and aligned their official duty on behalf of District 2's African Americans, Plaintiffs have had their voting strength re-diluted, as the

current model is no longer aligned with this Court's "quantitative fairness" judgment. Its continued enforcement impermissibly violates this Court's curative Section 2 and 5 remedy. Plaintiffs are now requesting this Court take immediate action to reverse and remedy the adverse effects of all of subdistrict elections occurring within Subdistrict 1 since 2010.

### B.  This Court Should Modify its Judgment

Plaintiffs believe this Court has the inherent authority under FRCP 60 (b) (5) to enforce its judgments, including authority to modify an institutional reform injunction when, due to time, the judgment and injunction has ceased to remedy the violation which it was intended to remedy. This situation has most often presented itself in the context of modification of a j decree where the court retains jurisdiction to protect and enforce its orders.

> So long as the final remedy under a consent decree has not been achieved, the court entering the decree retains subject matter jurisdiction to interpret and enforce the decree's terms. *See, e.g., Nehmer v. U.S. Dept. of Veterans Affairs*, 494 F.3d 846, 856 (9th Cir. 2007). The court entering the consent judgment is also the tribunal with the power to determine whether it has been fully complied with and should be dissolved or vacated. *See, e.g., Bd. of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 247–50, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991) (stating that a district court's clear, affirmative ruling that the consent decree is no longer necessary in its current form is required for the parties to it to no longer be bound by it); *see also Frew*, 540 U.S. at 442, 124 S. Ct. 899 (2004). Exactly how a court should enforce and protect its orders is an issue largely left to the discretion of the court entering the order, so long as that discretion is exercised reasonably.
> *Louisiana State Conf. of Nat'l Ass'n for Advancement of Colored People v. Louisiana*, 490 F. Supp. 3d 982, 1000 (M.D. La. 2020), *aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021)

The Federal Rules also provide a remedy when circumstances make it necessary to modify a permanent injunction.

> Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if, amongst other things, "applying [the judgment or order] prospectively is no

46

longer equitable." Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if "a significant change either in factual conditions or in law" renders continued enforcement "detrimental to the public interest." *Rufo* v. *Inmates of Suffolk County Jail,* 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). The party seeking relief bears the burden of establishing that changed circumstances warrant relief, *id.,* at 383, 112 S.Ct. 748, but once a party carries this burden, a court abuses its discretion "when it refuses to modify an injunction or consent decree in light of such changes." *Agostini v. Felton,* 521 U.S. 203, 215, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).

*Horne v. Flores*, 557 U.S. 433, 447, 129 S. Ct. 2579, 2593, 174 L. Ed. 2d 406 (2009).

Modification of an injunction under Rule 60 (b) (5) accepts and follows the underlying legal conclusions upon which the original injunction is based:

"Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests, but the Rule provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to public interest'." *Horne v. Flores*, 557 U.S. 433, 447, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)).

*Anderson v. City of New Orleans*, 38 F.4th 472, 478 (5th Cir. 2022)

Use of FRCP 60 (b) (5) to modify the original judgment is particularly appropriate in cases like the present one where the judgment concludes institutional reform litigation.

60(b)(5) serves a particularly important function in what we have termed "institutional reform litigation."[3] *Rufo, supra,* at 380, 112 S.Ct. 748. For one thing, injunctions issued in such cases often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment.

*Horne v. Flores*, <u>557 U.S. 433, 447</u>–48, <u>129 S. Ct. 2579, 2593</u>, <u>174 L. Ed. 2d 406</u> (2009).

### III.    Plaintiff-Intervenors Have Suffered Personal Harm

Judges elected to the First Circuit serve 10-year staggered terms and must run for re-election if they wish to continue serving on the court. Plaintiffs-Intervenors along with other African American candidates, confronted with the harsh reality that their rare election opportunity to District 2 of the First Circuit Court of Appeal is not equal under the current judicial map, in combination with ongoing racially polarized voting and its dilutive effect, have been discouraged from running for office, and, indeed, as a pattern have largely refrained from running, for a position on the First Circuit, with the exception of a few candidates.

In 2012, an election was held for District 2's Subdistrict 1, Division B.  White incumbent Judge J. Michael McDonald (61.5%) defeated Black Plaintiff-Intervenor Carter (39.5%) in a run-off election. The African American's preferred candidate of choice, Plaintiff-Intervenor Carter was defeated.

In 2022, an election was held for District 2's Subdistrict 1, Division B. White Judge Hunter Greene (54.4%) defeated Black Plaintiff-Intervenor Johnson (46.6%) in a run-off election. The African American's preferred candidate of choice, Johnson was defeated. There were no incumbents in this race.

Two years later, in the primary election held on November 5, 2024 for Subdistrict 1, Division C. white Judge Kelly Balfour (57%) defeated Black Judge Eboni Johnson Rose (43%) in the November 5 election. Johnson Rose, the African American's preferred candidate of choice was defeated. There were no incumbents in this race.

The record and pattern of elections to the First Circuit, District 2, supports a determination that the vestiges of past discrimination have not been eliminated to the extent practicable. Due to

population and demographic district shifts in the First Circuit, District 2, it was prudent of the Defendants to determine what changes were needed to remain in compliance with this Court's Judgment and Section 2 of the VRA ahead of any District 2, Subdistrict 1 elections, starting as early as 2010, but they did not do so.

Therefore, Plaintiffs seek judicial review that the judgment entered on August 30, 1991, made final on remand on April 17, 1992, be interpreted or modified to ensure that African American votes are not being diluted – devalued from lack thereof. Plaintiffs propose the Court order the Defendants to redistrict the First Circuit, District 2, every ten years in accordance with the Legislature's redistricting criteria, Joint Rule 21. Of most importance is that the Judgment ensure all future elections comply with this Court's remedy and Section 2. Plaintiffs are specifically asking this Court to interpret or modify the judgment to mandate District 2 be redistricted before any new elections are held by the Defendants.

Discovery could reveal any renewed exclusion policy or rational restraint practices for protecting or not protecting Black-voting rights and explicate the "widespread" malapportionment policy reasons, issues and decisions related to District 2.

In summary, to ensure compliance with this Court's Section 2 of the VRA remedial judgment, its Section 5 curative effects, and the permanent injunction entered herein, added deference and greater general equitable relief is due from this Court to reshape District 2's subdistricts to remedy effectively prolonged vote dilution. There is relatively little or no likelihood that the original violation and any recurrent violation will be finally cured by the existing judgment. Nor by the Defendants "new policy insights"[94] regarding malapportionment, and it is less likely both the Defendants and the Legislature will propose or enact statutory codification after 35 years

---

[94] See *Ronald Chisom, et al. v. State of Louisiana*, Case No.22-30320, particularly pages 27 and 28 (October 25, 2023), Fifth Circuit, United States Court of Appeal.

a corrective remedial modification of District 2's subdistricts. Consequently, Plaintiffs are requesting renewed emergency process and revamped relief.

## IV.  CONCLUSION

**"Rights For Me, Not For Thee"; "No Ways Tired"**

This case is about equal voting rights and equal protection violations. The fully developed trial record and the updated pleadings substantiate District 2's subdistrict electoral map is in violation of its remedial purpose, Section 2 of the VRA, and the Fourteenth and Fifteenth Amendments. The Defendants and the Legislature have entrenched respect for voting rights for whites as a majority[95]. Historically, in District 2, and throughout Louisiana respect for Black voting rights and equality in electoral opportunity is achieved in judicial elections only when judicially required by a federal court.

Such as, in redistricting recently the Louisiana Supreme Court, the eleven "Affected Courts"[96] subject to this Court's seminal 1991 judgment; and inside of District 2's State Capital plurality-Black municipal court[97]; but presently not for District 2's Blacks, neither as a racial minority, a numerical minority, nor a numerical plurality, "a position of rights for me, but not three". Make no mistake—the Legislature convenes to advance Black representation to elective office almost all of the time as a direct result of litigation.

Given the 33-year history that minorities have with the Defendants and their Legislature, along with the more recent events foretells these Plaintiff-foot soldiers are "no ways tired". Since 1991, Black voters in District 2, single-member Subdistrict 2, and in now in single-member Subdistrict 4, are geographically compact, and remain politically cohesive, particularly to end the

---

[95] *United States v. Louisiana*, 225 F. Supp. 353, 363 (E.D. La. 1963), *aff'd sub nom. Louisiana v. United States*, 380 U.S. 145 (1965).
[96] See Exhibit 2.
[97] Baton Rouge City Court, because of *Hall v. Louisiana*, Civil Action No. 12–00657–BAJ–RLB (M.D. La. 2015).

vestiges of past discrimination to the extent practicable in elections to the office of Judge, Court of Appeal in District 2. It is clear that the factual claims are not in dispute and that the Plaintiffs are entitled as a matter of judgment with deliberate speed to a more effective remedy.

The evidence and this updated memorandum in support of this Motion exposes the inherent "quantitative (un)fairness" going on in the judgment, which undoubtedly shapes the abusing remedy. The Defendants and the Legislature have chosen not to fix the "new Negro problem", in accordance with the predictive model this Court mandated more than three decades ago.

Substantial changes in District 2 between 1990 and 2020 in the underlying remedy criterion, and distinctive shifts in District 2's and its subdistrict populations and demographic metrics and measures necessitate a remedy review and "quantitative fairness" adjustment in District 2 as anticipated by this Court.[98] The final remedy contemplated in this case is prospective compliance with this Court's Judgment, consistent with Section 2 and then-constitutionally applied Section 5 of the VRA.

This Court proscribed the eight remedial factors and the remedial redistricting structure around which systematic analyses of District 2's subdistricts are to be conducted. It is the guide for safeguarding the remedy. An interpretation or modification of it is a useful remedial corrective at this time, consistently with the legitimacy of the 52-year legacy of this Court, and its 33-year-old judgment. The judgment's final remedy has not been realized because as early as 2020 a second minority-majority district could have been established in Subdistrict 1.

This Court's remedial judgment has allowed population deviations to increase extremely in the existing subdistricts. Nonetheless, the Defendants and the Legislature are neither stymied, nor estopped, from remedying this issue. The Defendants and the majority in the Legislature have

---

[98] See Findings of Fact and Conclusions of Law Remedy Phase, June 12, 1990, p. 3. M.D. No. 86-435-A.

never sought to redraw District 2's subdistricts to comply with the VRA, post the inception of this Court's original judgment.

Moreover, the Defendants' very recent legal argument in *Chisom* is clearly inconsistent with their repetitive inaction to redress Plaintiffs' malapportionment harms in this case. They have selectively chosen not to redistrict the First Circuit, District 2 despite higher "widespread" malapportionment than that amongst the seven Louisiana Supreme Court districts. They have selectively chosen not to redistrict any of the eleven "Affected Courts" subject to this Court's 1991 judgment, despite higher "widespread" malapportionment than that amongst the seven Louisiana Supreme Court districts.

Plaintiffs represent that there is vote dilution and inferentially intentional race discrimination regarding District 2 elections to resolve between this Court's remedial judgment and also the present set of circumstances, particularly now, and especially in light of the tension produced by the recent *Chisom* litigation and the appellate court's dismissal decision therein.

On August 29, 2024, a majority of the *en banc* panel of the U.S. Court of Appeals for the Fifth Circuit issued a decision that allowed the state of Louisiana to end the landmark *Chisom* consent decree.[99] The effect of the decision allows Black Louisianans to have an additional opportunity to elect a judge of their choice in a Baton Rouge-based district.[100] The Defendants and the Legislature have never statutorily enacted such a remedy here, let alone a durable one, for District 2 of the First Circuit.

**Louisiana's "New Policy Insights"**

---

[99] See opinion at https://www.ca5.uscourts.gov/opinions/pub/22/22-30320-CV1.pdf
[100] See Legal Defense Fund's response to dissolution of the *Chisom* Consent Decree at https://www.naacpldf.org/wp-content/uploads/Dissolution-of-the-Historic-Chisom-Consent-Decree-.pdf

Federal constitutional and statutory voting rights must again be protected for District 2's Black Americans. This Court's enforcement of its judgment for the protection of Black voters and candidates must be safeguarded. The Defendants' recent revelation about their desire to adopt and to adhere to "new policy insights" regarding malapportionment in judicial districting and their lack of behavioral coordination and correlation with that of this Court's District 2's remedial "equipopulous" standard in redistricting in state judicial elections are not arguably mutually exclusive.

Instead, when done right, they go hand in hand. That is why Plaintiffs are at the verge of yet another milestone with the Defendants' remarkable transformation while simultaneously seeking to achieve historic increases in Black lawyers and judges' opportunity to serve on the First Circuit. This motion follows a lengthy historical and jurisprudential record, and memoranda recitation outlining "widespread" abuse of Black voting rights and race discrimination throughout Louisiana's judicial election legacy.

The Defendants and the State have reluctantly made progress in elections to the state Supreme Court on improvements pursuant to the settlement under the *Chisom* Federal Consent Decree, and recent dismissal on August 29, 2024. See Act 7 of the 2024 Regular Legislative Session[101] redistricting the seven districts of the Louisiana Supreme Court with a relative overall deviation of less than 10%. Prior to the ruling, in May 2024, Louisiana added via Act 7 a second majority-Black state Supreme Court district to settle a separate lawsuit.[102] Consequently, the First Circuit's second and only Black Chief Judge, the Honorable John M. Guidry, has been elected and

---

[101] See Act 7 at https://www.legis.la.gov/Legis/BillInfo.aspx?s=24RS&b=SB255&sbi. See Resume Digest at https://www.legis.la.gov/Legis/ViewDocument.aspx?d=1384464

[102] See Louisiana State Conference of the NAACP v. Louisiana, Middle District of Louisiana, Case No. 3:19-cv-00479-JWD-EWD; Record Doc. No. 225

assumes office January 1, 2025. However, such progress has not and it will not voluntarily occur in District 2, except from an order recalibrating the 1991 subdistrict remedy.

Louisiana should lead as a model by working with, safeguarding the voting, and the electoral rights of District 2's Black Americans. Louisiana recently expressed to the U. S. Supreme Court that it is "tired" of defending various and varied voting rights cases brought for and against it by its citizens. District 2's Black voters and judicial candidates are "no ways tired" of seeking a state and a nation where just and equitable remedies for violations of their hard-earned federal civil rights as equal citizens.

Taken literally, Benjamin Franklin's maxim that "an ounce of prevention is worth a pound of cure" suggests the six legislative bills referenced herein above or absolute adherence to Judge Parker's controlling eight metrics and measures of state prevention of the harms to District 2's Black citizens, voters, and candidates would have been a more efficient and an effective remedy, than the monetary currency it originally spent during five years of protracted litigation regarding liability, and it will spend to delay and avoid the now after-the-fact treatment (or "cure of their quest for equality in voting and election opportunity") "no ways tired" Plaintiffs deserve.

The Defendants appear to have also selectively discriminated against African Americans within the five circuits of the Court of Appeal by intentionally selecting not to address "widespread" population discrepancies throughout each of districts composing each of the five circuits. The judgment in this case has not frozen the hands of the state.

District 2's unique ecological issues emanated from the findings and judgment in this case and the changes in District 2 since this Court's judgment are not "built in". See "built in" rationale on pages 2 and 4 as discussed in Exhibit 17. Pointedly, this fact was presented to the Legislature

in Plaintiffs' correspondence.[103] The Defendants know and the Legislature knew of District 2's population discrepancies via JMC's report in response to a variety of Senate Resolutions regarding judicial redistricting, particularly resolutions 235, 236, 237, 238, and 239[104] of the 2021 Regular Session. The Louisiana Senate requested each of the five circuit courts of appeal "submit recommendations for redistricting the election districts and sections of the court based on the 2020 federal census to the Senate no later than December 31, 2021."

The Defendants and the Legislature may have relied on JMC's "built in" population discrepancy proposition as one of two bases as to why they chose, soon after the 2020 census report, to discriminate selectively against African Americans within the five circuits of the Court of Appeal. The Defendants recently expressed a similar prophylactic argument in *Chisom,* when they asserted the Consent Decree in that case prevented them from redressing "widespread" malapportionment among the Louisiana Supreme Court districts.[105] JMC provided no conceptual explanation or legal authority for the term "built in". No reference was cited to support a "built in" premise. JMC's explanatory basis articulated normalization basis is equivalent to a non-equalized population rationale, specifically regarding District 2 of the First Circuit. JMC's "built in" terminology is akin to Louisiana's 1898 Constitution's, "grandfather" clause[106], officially disenfranchising Black voters and jurors, "a pretty *prima facie* way to allow whites to vote [disproportionally], and not Blacks."[107]

Cognizant of the distinct demographic changes in District 2, that is, District 2 taken as a whole went between 2010 and 2020 from a 49-46% white plurality to a 47-43% Black plurality,

---

[103] See Exhibits 4B and 7.
[104] See SR 235 through 239 at https://senate.la.gov/s_video/videoarchive.asp?v=senate/2021/06/061021SCHAMB starting at 1:22.
[105] See SR 240 at https://senate.la.gov/s_video/videoarchive.asp?v=senate/2021/06/061021SCHAMB starting at 1:41.
[106] See https://64parishes.org/entry/louisiana-constitution-of-1898
[107] See https://www.npr.org/sections/codeswitch/2013/10/21/239081586/the-racial-history-of-the-grandfather-clause

and that District 2's, Subdistrict 1's foundational single-member Subdistrict 4 went from a white plurality to a Black majority, the Defendants selectively and intentionally singled-out not to redistrict Louisiana's First Circuit Court's malapportionment. Such choice is clear evidence of more than a prima facie case of strategic intentional race discrimination, presumptively unconstitutional, not in avoidance of a violation of Section 2, and certainly in violation of this Court's judgment.

Moreover, the Defendants by intentionally selecting out their "widespread" discrepancy "new policy insight" in *Chisom* as one of their bases in support of their claim seeking to redistrict Louisiana Supreme Court's malapportionment – while first, not before, during, and afterwards seeking to address "widespread" population discrepancies throughout each of districts composing each of the five circuit courts, and the ten other "Affected Courts" remaining subject to this Court's 1991 curating judgment – the Defendants likely exhibited a pattern of behavior evidencing an intent to discriminate.

Furthermore, the Defendants while not previously, during, and afterwards seeking to address "widespread" population discrepancies throughout each of the three districts and sections composing the East Baton Rouge Family Court, although not premised on JMC's "built in" precept, the Defendants have likely exhibited a continuing pattern of behavior evidencing an intent to discriminate against African Americans within and across the Family Court within District 2.

Lastly, the Legislature is more likely than not going to maintain their old "tired" habits restraining and trapping District 2's Blacks to a single judgeship on the First Circuit as they did when Governor John Bel Edwards vetoed their decision limiting Louisiana to a single Black congressional representative, March 8, 2022.[108]

---

[108] House Bill 1. See Veto Letter of Governor John "Bel" Edwards at https://www.legis.la.gov/Legis/ViewDocument.aspx?d=1258719

Waiver or Forfeiture of Sovereignty, Legislative Deference, and Judicially Estopped

The Legislature continues to this day to legislatively codify a remedy for the voting regime that originally violated the VRA in this case. It relies on this Court's 1991 judgment to hold state judicial elections for judgeships in District 2. The Legislature has not presented a map that fairly, fully, and finally enfranchises District 2's Black voters. If the Defendants and the Legislature had taken Plaintiffs' claims seriously starting in 2011, the necessity to defend this motion for additional remedy relief would have been avoided and the voting and career harms to Plaintiffs aborted. This Court must use the remedial flexibility it has in recrafting new subdistricts to remedy previous, current, and future VRA violations. In the alternative, it can simply adopt one of Plaintiffs' proposals, which squarely meets this Court's judgment and Joint Rule 21.

Plaintiffs' experiences with the Defendants and the Legislature have confirmed that redistricting District 2 should remain with this Court, rather than the Legislature. The Legislature has shown it is incapable of balancing the myriad factors and traditions to apply legitimate court-imposed districting polices regarding District 2. Starting in 2010, Plaintiffs have made every effort not to again pre-empt state sovereignty. This Court made every effort 36 years ago. The Legislature declined to do so, to assist District 2's Black voters and candidates to exercise their personal sovereignty.

Additionally, the Defendants and the Legislature are judicially estopped from asserting any procedural and substantive objection or legal defenses to this fact. The doctrine of judicial estoppel[109] also prevents them from asserting a position in this proceeding that directly contradicts the premises of their dissolution positions asserted in *Chisom*. Moreover, the Defendants and the

---

[109] See, e.g., *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988); *Patriot Cinemas, Inc. v. Gen. Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987); Lawrence B. Solum, Caution! Estoppel Ahead: Cleveland v. Policy Management Systems Corporation, 32 Lov. L.A.L. Rev. 461, 471 (1999).

Legislature have abandoned their civic duty to protect the voting rights of its de jure and *de facto* disenfranchised Black citizens. Plaintiffs are aggrieved.by Defendants failure to redress recurring violations of this Court's Judgment and the VRA in elections in District 2.

Oversight and governance by this Court of its judgment will insure future Black voting rights are protected and the Defendants are and remain in compliance with the judgment of this Court, the VRA, and the Constitution. Congress has mandated the judgment completely remedy the prior dilution of minority voting strength <u>and</u> fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice (emphasis added). Senate Report at 31. The Section 2 remedial and Section 5 curative judgment in this case is the law of the land. It has been invoked by the Plaintiffs and must be enforced to reshape an equitable and sustainable remedy to prevent future inequity.

Louisiana, Here's Why You're "Tired", and How To Fix That

As early as the 2011 legislative session, the Legislature itself, and the Defendants through a new executive order could have fixed Plaintiffs' problem, as discussed and documented hereinabove, but together they chose to live continuously under the non-elected judge-imposed subdistricting map, with a single-member majority Black subdistrict. That 1991 judgment only mandated at least one Black single-member subdistrict.

Unlike the Defendants and the Legislature's "espoused" reasons of complying with the "likelihood of a VRA violation" in Louisiana v. Callais and Robinson v. Callais, or the political goal of protecting Republican incumbents, no incumbent let alone, Republican judge was up for reelection because of age-based term limits in District 2 in 2020 and since. Defendants simply cannot avoid the inference of evidence that race discriminatory politics drove their decision not to redistrict District 2's lines in S.B. 68 (2023) and S.B. 399 (2024). Moreover, S.B. 400 (2024) for

East Baton Rouge Family Court would have returned the overall deviations and malapportionment to the adopted Dr. Weber's redistricting standard approved for that court in 1991.[110] Indeed, the same reason the Legislature has never presented a plan to this Court to discontinue the application of this Court's one majority-Black single member district map.

Louisiana has never committed from the outset to creating majority-minority districts, especially so here where this Court's decision itself backed Louisiana into consenting to the first majority-Black district on the First Circuit. Louisiana has never adopted a new map to comply with this Court's judgment nor has it adopted a map to comply with the VRA. There can be no question that the State had no good reason not to believe that this Court's judgment or that the VRA required a second majority-Black district in District 2. This Court expressly established the eight factors which guides, controls and regulates how to know when their failure to include a second majority Black district arises.

That Defendants and the Legislature have no answer is best illustrated by their bottom-line position: With the exception of the newly elected Attorney General Elizabeth "Liz" Murrill's response – in a request for an attorney general opinion – not one of the former state executive officials and none of the former and current state elected officials responded to correspondences and demands from the Plaintiffs, except the sponsors of the six Legislative Bills referenced earlier. Not a single response from the Defendants, nor the Legislature.

As Plaintiffs well know, the U.S. Supreme Court's precedents entitle the Legislature to the first shot at remedying any redistricting problem. However, after more than 33 years of "breathing room"[111], the Legislature has waived, abandoned, forfeited, consented or chosen to forego that

---

[110] See Defendants' Remedy Proposal dated August 21, 1991. The overall deviation equaled .30% amongst the three then-divisions of Family Court.
[111] *Bethune Hill v. Virginia State Bd. Of Elections*, 580 U.S. 178, 196 (2017).

sovereign choice, having abandoned District 2's Black plurality to the remedial merits decision squarely pending before this Court.

For these reasons, this Court must again adjudicate reality and remove Louisiana from their untenable same old "tired" sovereign position, especially when it comes to creating fair District 2 election maps. This Court's involvement in interpretation and modification of its original redistricting model for District 2 is more than justified and productive. This Court's case law in this area is perfectly clear. This Court's Section 2 and Section 5 precedents required redistricting and Plaintiffs' demand reconsideration. This Court must resume the remedial process because the Defendants and the Legislature will not consider such maps without a corrective order from this court.

Plaintiffs highlighted both the Defendants and the Legislature's conspicuously disingenuously asserted basis of their Motion to Dissolve *Chisom*; Denying Plaintiffs relief here would be inequitable. Neither the Defendants nor the Legislature has a legitimate interest in the continued enforceability of the judgment as is; nor should they be allowed to regress on their exhibited illegitimate interest in keeping the status quo. This Court must be highly circumspect about allowing the Defendants and the Legislature to return to its old legacy and discriminatory habits.

From July 1, 1986 (i.e., the day this action was filed), every relief Plaintiffs secured was judicially forced, the result of years of judgments against the Defendants. Plaintiffs obtained a declaratory judgment that the state's method for holding judicial elections in District 2 violated the VRA. A permanent injunction barring the state's unlawful method from use in future elections, and a court order directing the Legislature to submit or enact a new lawful plan by a court-imposed deadline. Squarely, and only because of legislative doing wrong, by doing nothing, this Court

adopted its own remedial plan using expert recommendations from the parties, choosing the adopt Defendants' plan which remains in effect.

Procedurally, Plaintiffs directly ask the Defendants to notify immediately this Court and us if the Governor will call for a recalibrated remedy. Or if the Legislature will immediately convene a special session to adopt one of Plaintiffs' redistricting plans (Exhibits 12 and 16), or an alternative plan, configuring a single-member Black-majority subdistrict inside of the existing Subdistrict 1, or an alternative valid VRA plan, using Joint Rule 21.

Because of the acknowledged and anticipated reluctance of Louisiana's Justice Department – given limited resources and being tired of VRA cases – to investigate independently all of the relevant data, changes and Plaintiffs' circumstances with respect to protecting their voting rights and electoral equality, as jurisprudentially established by this Court, pursuant to the VRA, Plaintiffs presents to this Court compelling evidence.

We await the Defendants' newest policy preferences in their response. "Plaintiffs won [their] case on the facts and the law in 1988, won it again in 1990 and again in 1991."[112] This Court should find no reasonable cause for further remedial delay.

In summary, despite binding U.S. Supreme Court and this Court precedent allowing Louisiana to redistrict when there is good reason to believe they must do so to comply with the VRA, the Defendants and the Legislature have chosen not to redistrict District 2 in the face of overwhelming evidence. Even if the Defendants and the Legislature have engaged in practices without any discriminatory motive, their practices have had a discriminatory impact. Today's statistics tell an entirely different story with respect to racial discrimination in District 2.

---

[112] See Document 633, page 34 filed herein August 29, 1991.

Consequently, this Court should note probable jurisdiction, grant Plaintiffs' remedial motion, and summarily issue a more effective remedy. Alternatively, expeditiously set the case for remedial due process, argument and trial; and thereafter judicially counter the "doing wrong by doing nothing" inaction of the Defendants by providing clarity to the Plaintiffs' judgment attempting to have the Defendants square this Court's VRA's judgment and the U. S. Constitution in Louisiana.

Louisiana is not trapped between this Court's final April 17, 1992 VRA-Remedial Judgment and *Chisom's* effective August 21, 1992 VRA-Consent Judgment. Louisiana entrapped its District 2's Black voters, lawyers, and judges long ago. As state captives, its high time Plaintiffs freed themselves from the single-member Black Subdistrict 2. Let the Plaintiffs make the necessary adjustments to heed the instruction of the Court. Keep the pen in the Middle District Court's hand of a non-elected judge, and not return it to the hands of the Defendants and the Legislature; until Plaintiffs secure equal standing before the court of law and justice. With this Court's help, they will.

This case for a second Black judge on the First Circuit in District 2 is even stronger than that of the case for a second Black congressional representative pending at this time before the U.S. Supreme Court. Louisiana has returned to its former violations. Given the timing, post the 1991 judgment, Louisiana's "during wrong, by doing nothing" is a matter of public record. The Defendants and the Legislature forsakes their duty and places District 2's Black voters and candidates in an intolerable disadvantage legally and tactfully.

Plaintiffs' claims rest on the foundation of failed pluralism in Louisiana's political process. Thusly, Plaintiffs assert and rely on the law, judgment, and empirical and tangible evidence presented in support of their Motion and this Court's remedial authority to seek rationally and

reasonably, the following durable relief pursuant to this Court's original Judgment and its inherent authority:

a) Set an immediate scheduling order or status hearing to establish an expedited and streamlined scheduling order to challenge or validate evidentiary aspects of this motion and to resolve the legal issues raised in this Motion and Memorandum;

b) Immediately enter an order appointing a court expert to provide analysis of African American voter dilution effects in all judicial elections for District 2, Subdistrict 1 since this Court's August 1991 judgment;

c) Declare all elections in District 2, Subdistrict 1 since 2010 are in violation of this Court's Findings of Fact, Conclusions of Law, and Equipopulous Remedial Subdistricts Judgment;

d) Declare all elections in District 2 Subdistrict 1 since 2010 unlawfully dilute African American voting strength and result in the denial of Plaintiffs' opportunity to participate equally in the electoral process and to elect judges of their choice, in violation of this Court's Judgment and in violation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973;

e) Set an immediate scheduling order or status hearing to establish an expedited and streamlined scheduling order to challenge or validate evidentiary aspects of this motion and to resolve the legal issues raised in this memorandum;

f) Immediately enter an order appointing a court expert to provide analysis of African American voter dilution effects in all judicial elections for District 2, Subdistrict 1 since this Court's August 1991 judgment;

g) Decertify commissions to offices for all elections held in District 2, Subdistrict 1's Divisions A, B, and C since 2010; and order new special elections under a remedial plan;

g) Enjoin the issuance of all future state election certifications for the offices of judge in District 2, Subdistrict 1 until further orders of the Court;

h) Order into effect a new election model for District 2, at a minimum from either of the single member districts or the multi-member district plans presented in this memorandum, which does not dilute African American voting strength and which upholds this Court's remedial judgment and Section 2 of the VRA;

i) Appoint a racially polarized voting analysis (RPV) and vote dilution expert to monitor voting and election events and make real-time recommendations to the Court to assure future compliance with this Court's Judgment and the VRA in District 2;

j) Appoint a technical advisor and promptly issue a remedy relief report regarding the effectiveness of the new remedial judgment after the 2030 federal decennial census;

k) Order the parties to file a joint remedy status report on changes in this Court's subdistricting factors and shifts in population in District 2 with the Court within 60 days post promulgation of the 2030 federal decennial census;

l) Retain authority, maintain continuing and indefinite jurisdiction to redraw District 2's subdistricts. Louisiana's Legislature has never enacted and presented a valid statutory plan to this Court for District 2; and

m) Grant Plaintiffs reasonable attorneys' fees and costs as provided under 42 U.S.C. 1983 and 1988; and for such other and further remedial relief as this Court deems just, proper, and equitable.

<div style="margin-left: 40%;">

Respectfully submitted,

THE MALEY LAW FIRM
/s/ MARTIN K. MALEY, SR.
Martin K. Maley, Sr., Bar Roll No. 20933
P. O. Box 3154 (70821)
4707 Bluebonnet Boulevard, Suite B
Baton Rouge, LA 70809
Telephone: (225) 346-6781
Facsimile: (225) 346-6788
Email: mkmaley@eatel.net

STEVE IRVING, LLC
/s/ STEPHEN M. IRVING_ (of counsel)
Stephen M. Irving, Bar Roll No. 07170
P. O. Box 2108
Baton Rouge, Louisiana 70832
Phone: (225) 933-5993
Fax: (225) 346-6788
Email: steve@steveirvingllc.com

</div>

## CERTIFICATE

**I HEREBY CERTIFY** that, pursuant to this Court's Administrative Procedures for Filing Electronic Documents, Rule I (F)(3), that each signatory to this filing has agreed to the form and the substance of the document and that I have authority to submit this document electronically. Baton Rouge, Louisiana, this 20th day of January 2025.

<u>/s/ *Steve Irving*</u>
Steve Irving

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 20, 2025, the foregoing was filed electronically with the Clerk of Court by using the CM/ECF system. Notice of this filing will be sent to all parties who participate in electronic filing by operation of the Court's electronic filing system.

<u>/s/ *Steve Irving*</u>
Steve Irving

Ernest L. Johnson
ernestjohnson@lacapfund.com
Lead Attorney for Original Plaintiffs and Class Members

Angelique Freel (LSBA No. 28561)
James G. Evans (LSBA No. 351222)
Jeffery M. Wade (LSBA No. 36070)
Angelique.Freel@la.gov
Gary.Evans2@la.gov
Jeffrey.Wale@la.gov
Counsels for Honorable Jeffery "Jeff" Landry, Governor of Louisiana

Carey Tom Jones (LSBA No. 07474)
jonescar@ag.louisiana.gov
Counsel for Honorable Elizabeth "Liz" Murrill, Attorney General of Louisiana

Celia R. Cangelosi (LSBA No. 12140)
celiacan@bellsouth.net
Counsel for Louisiana Secretary of State
Honorable Nancy Landry, Secretary of State of Louisiana